UNITED STATES of America, Plaintiff,

v.

**REAL PROPERTY KNOWN AS 77 EAST 3RD STREET, NEW YORK, NEW YORK, Described as Block 445, Lot 47 in the Records of the Clerk of the County of New York, Defendant–in–Rem.**

No. 85 Civ. 3351 (SS).

United States District Court,
S.D. New York.

Sept. 14, 1994.

Pamela L. Dempsey, U.S. Atty's Office, New York City, for U.S.

Nina J. Ginsberg, DiMuro, Ginsberg & Lieberman, P.C., Alexandria, VA, for Real Property Known as 77 E. 3rd St.

Merril Rubin, Mark Gombiner, New York City, for Church of Angels, Inc.

*OPINION AND ORDER*

SOTOMAYOR, District Judge.

Defendant-in-rem 77 East 3rd Street, New York, New York (the "Building") is a six-story building located on the Lower East Side of Manhattan. Since 1969, the Building's first floor has served as the meeting place or "club house" of the New York City ("NYC") Chapter of the Hells Angels Motorcycle Club ("HAMC"), an organization whose founding members include claimant Sandy Alexander. The Building's upper five floors contain residential apartments, the majority of which are occupied by HAMC members.

A nationwide investigation of the HAMC, launched in or about 1977 to 1985 by the Federal Bureau of Investigation (the "FBI") and other federal, state and local law enforcement agencies, revealed that HAMC, through its individual chapters, including the NYC Chapter, was conducting illegal drug transactions. As a result of the investigation, numerous HAMC members from various chapters across the country were arrested and prosecuted. On May 2, 1985, law enforcement agents raided the Building and thereafter, over a dozen members, former members and associates of the NYC Chapter of HAMC, including claimants Colette and Sandy Alexander and a trustee of claimant the Church of Angels, Inc. (the "Church of Angels"), Paul Casey, were all convicted and sentenced for narcotics-related offenses.

The federal drug forfeiture laws, 21 U.S.C. § 881, were amended by Congress on October 12, 1984, to permit forfeiture of real property used for narcotics-related activities. *See* 21 U.S.C. § 881(a)(7) (1994). On May 1, 1985, plaintiff United States of America (the "Government") filed a complaint against the Building alleging that it was subject to forfeiture under 21 U.S.C. § 881(a)(7) because the NYC Chapter of HAMC, on or after October 12, 1984, the effective date of the forfeiture amendment, to May 2, 1985, the date of the raid, had used the Building to commit and to facilitate the commission of felony narcotics transactions.

Sandy Alexander, his wife Colette Alexander and the Church of Angels subsequently intervened as claimants in this action.[1] On February 4, 1994, after an approximately five-week trial, the jury returned a verdict in favor of all of the claimants. Specifically, the jury found that the claimants had proven, by a preponderance of the evidence, that defendant-in-rem, the Building, was not used, or intended to be used, to commit, or to facilitate the commission of, a felony drug violation between October 12, 1984 and May 2, 1985.

The Government now moves for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), and alternatively, for a new trial under Fed.R.Civ.P. 59(a). The Government argues that during the trial, the claimants admitted using the Building to commit felony narcotics violations, namely the distribution of methamphetamine and cocaine, and failed to rebut the Government's probable cause showing. Therefore, asserts the Government, no reasonable jury could have concluded that claimants had met their burden of proving that the Building was *not* used to facilitate narcotics felonies. According to the Government, the "claimants' improper pleas for sympathy incited the jury to nullify the forfeiture law that th[e] Court instructed the jury to apply," and the jury's verdict, therefore, must be set aside.

I disagree with the Government's description and assessment of the evidence in this case. The Government sought at trial to portray the Building as the nerve center from which all the NYC Chapter HAMC members' illegal activities flowed. Yet, having lost its star witness, William "Wild Bill" Medeiros, a founding member of the NYC Chapter and the only Government witness who purportedly had personal knowledge of drug transactions in the Building, the Gov-

1. The claimants have disputed the ownership and possessory interests of each other in the Building. Because only state law property issues were involved in the disputes among the claimants and a jury verdict in favor of or against all claimants on the forfeiture question would have obviated the need to decide the state law issues, I decided to try the forfeiture question first. The jury's verdict in favor of all claimants removed all federal claims from this action and there being no just reason to retain supplemental jurisdiction over the state law property issues among the claimants, I entered judgment on February 24, 1994, dismissing the complaint and this action.

ernment was left with rather inconclusive, and in some instances, scanty and highly unreliable evidence tying the Building, as opposed to the individuals, to the felony narcotics violations alleged. The Government ostensibly believes that the confessed criminality of the individual members of the HAMC group, and perhaps even their unorthodox lifestyle, should have enveloped the Building in a cloud of criminality in the jurors' mind. Such, however, was not the case. Based on the evidence presented at trial, viewed in the light most favorable to the claimants, I can not conclude that the jury's decision was unreasonable in the least and find no reason in the record to grant the Government's motion for judgment as a matter of law, or its alternative motion for a new trial.

## THE EVIDENCE AT TRIAL

### I. The Government's Direct Case

■ In order to assess the Government's motion, and the sufficiency of the evidence in this case, it is necessary to carefully and accurately set forth the evidence, or lack of evidence, presented at the trial of this action. At a forfeiture trial, the government bears the initial burden of demonstrating probable cause to believe that the real property at issue was used or was intended to be used to commit or facilitate the commission of felony narcotics violations. To meet its burden in this case, the Government presented three experts, an undercover agent and a cooperating witness to establish the requisite nexus between the Building and (1) Sandy Alexander's admitted cocaine sales, and (2) the alleged club-wide conspiracy to manufacture and distribute methamphetamine.

### A. The Government's Expert Witnesses

### 1. State Investigator Louis Barbaria

The Government's first witness was New York State Police Investigator Louis G. Barbaria, Jr., a self-styled expert on outlaw motorcycle gangs, including the HAMC. His opinions about the structure and practices of HAMC and the NYC Chapter were based, in

part, on intelligence gathered during the nationwide investigation known as "Operation Roughrider," and his debriefings of former HAMC members and cooperating witnesses, including William "Wild Bill" Medeiros, a founding member of the NYC Chapter of HAMC and Robert Banning, a member of the Bridgeport HAMC Chapter.

The parties to this action had stipulated that from the NYC Chapter's inception in 1969 until March 25, 1984, Sandy Alexander was the president of the Chapter. Stipulated Facts ("Stip. Facts") ¶ 6. He was succeeded by William Medeiros, who left the post four months later. *Id.* at ¶ 53. Paul Casey then assumed the presidency. *Id.* at ¶ 24. Barbaria testified that the other officers of the NYC Chapter of HAMC were the vice-president, secretary, treasurer, road captain and security officer.

"Socially [and] business-wise," the clubhouse, according to Barbaria, "was basically the hub of [HAMC] activity." Tr.[2] at 228. "Church meetings," mandatory weekly club meetings of HAMC members, were, according to Barbaria, the "center of Hells Angels activities." Tr. at 172. The NYC Chapter of HAMC held its weekly church meetings in the clubhouse located on the first floor of the Building. Minutes of the meetings were kept (Tr. at 172–73), and attendance was noted therein. Tr. at 176. The actual minutes of meetings from July 1982 to March 1985 were seized during the May 2, 1985 raid and were admitted into evidence. Tr. at 173.

Barbaria also testified about the "lifestyle" of NYC Chapter HAMC members, and described it as consisting mainly of motorcycle runs, parties and drugs. Tr. at 206–07, 465–66. According to Barbaria, very few of the members held steady jobs, and many simply loitered around the clubhouse. Tr. at 207–08. He further described the travel by members all over the country, and indeed, the world, to attend anniversary parties of HAMC chapters. Tr. at 210–11. He further testified that methamphetamine, also referred to as "crank" or "speed," was the "fiber" of the NYC Chapter of HAMC during the period October 12, 1984 to May 2, 1985,

---

**2.** "Tr." refers to the trial transcript.

and would be passed freely at parties. Tr. at 465–66.

To finance this lifestyle of constant partying and drugs, the NYC Chapter, according to Barbaria, manufactured and distributed methamphetamine. Barbaria described the NYC Chapter's methamphetamine enterprise as follows:

> A. Well, basically, there were three people within the New York City Chapter of the Hells Angels that controlled the acquisition of, the obtaining of, the drugs and the distribution within the membership, and those three people were Mr. Sandy Alexander, who was basically the head of this drug organization, Mr. Howie Weisbrod, the vice president at the time—he distributed the drugs primarily to other members of the Hells Angels—and the third individual was Mr. Paul Casey, who is in the courtroom here also, and he was primarily the manufacturer.

Tr. at 215. The other members of the NYC Chapter, according to Barbaria, participated in the methamphetamine conspiracy "by obtaining the drugs from this organization and then [going] out and d[oing] their own distribution." *Id.*

Barbaria stated that the Weisbrod–Alexander–Casey run methamphetamine project began to breakdown in 1983, and "by the end of 1984, ... wasn't effective anymore ... [and] didn't operate along [the same] lines." Tr. at 216. He further testified that some members became frustrated with restrictions on methamphetamine distribution imposed by the Weisbrod–Alexander–Casey control group, and formed a "Nomad" chapter in October 1984, to distribute greater quantities of methamphetamine than was permitted in the NYC Chapter. Tr. at 451–53.

According to Barbaria, the NYC Chapter's methamphetamine manufacturing and distribution activities continued up until the time of the May 2, 1985 raid, albeit in a different manner. After the breakdown of the Weisbrod–Alexander–Casey control group, individual members distributed methamphetamine obtained from other sources. Tr. at 216. Barbaria based his conclusion that the methamphetamine conspiracy continued until the date of the raid on several factors: (1) information derived during Operation Roughrider; (2) drug purchases made by an FBI undercover agent from various members during that period; and (3) certain physical evidence seized from apartments in the Building during the May 2, 1985 raid. With respect to the physical evidence, Barbaria deemed the high purity of the .39 grams of methamphetamine found in HAMC club member Brendan Manning's apartment especially telling. Barbaria opined that the purity of those narcotics was "consistent with someone who's in the distribution end of an enterprise." Tr. at 218. He also stated that the lifestyle of parties, travel and motorcycle runs did not end with the breakdown of the Weisbrod–Alexander–Casey enterprise, and thus, the members "had to make their money from some source." Tr. at 218.

On cross-examination, Barbaria admitted that there was a "drought" in methamphetamine during the fall of 1984 to spring 1985 because Paul Casey had stopped manufacturing (Tr. at 459); that there was a club rule against discussing illegal activities during church meetings (Tr. at 337); that several members and their spouses or live-in girlfriends were employed (Tr. at 373–98); that generally a representative of a chapter, not the entire chapter, traveled to out-of-state HAMC anniversary parties or events; that the Building was not "a lap of luxury" (Tr. at 348, 418); that he could not tell when the alleged cutting agents found in Sandy Alexander's apartment had last been used (Tr. at 286–87); and that the grinder found there was not in itself indicative of a methamphetamine conspiracy. Tr. at 288.

### 2. *Sergeant Terry Katz*

Maryland State Police Sergeant Terry Katz, an expert on drug conspiracies, offered testimony on the significance of the physical evidence seized from the Building during the May 2, 1985 raid. In the apartments of Paul Casey, Sandy Alexander, Brendan Manning and Michael Manfredonio, FBI agents found small amounts of high purity methamphetamine, and substances, such as mannitol, inositol and dextrose, which are commonly used as drug dilutants or "cut." Stipulated Facts

¶¶ 9, 26, 46, 50. The agents also retrieved from those apartments (1) small amounts of cocaine; (2) clean vials; (3) a small grinder; (4) two small spiral notebooks with handwritten notations; (5) a Bearcat scanner; (6) two telephone wire testers; (7) a hand held bug detector; and (8) a bug sweeper. In addition, FBI agents found two Ohaus triple beam balances and an Ohaus dial-a-gram balance from the third floor apartment of Martha "Marty" Grabe, a tenant in the Building who was not an HAMC member.

At trial, based on stipulated facts, the Government offered a chart listing the items seized from the various apartments, but presented no evidence as to where in the apartments the items were found. Moreover, the Government did not introduce the actual seized items into evidence. Near the end of the trial, the parties realized that certain items had been returned to the claimants after the criminal trials, and the claimants introduced some of these into evidence during Paul Casey's testimony.

Sergeant Katz testified as follows about the seized items:

(1) highly pure methamphetamine such as that found in Brendan Manning's apartment strongly suggests that the possessor is very close to the original source of the drug's manufacture (Tr. 1044, 1053);

(2) cutting agents are used by drug distributors to increase profits by increasing the weight of the drugs sold (Tr. at 1044–45);

(3) drug users do not use cutting agents because the agents dilute the product and ostensibly their effect (Tr. at 1047);

(4) inositol, mannitol, and sugars, such as dextrose and lactose, are commonly used to "cut" methamphetamine, and inositol may be used to cut cocaine as well (Tr. at 1045–47);

(5) scales are commonly used by drug distributors to weigh their products (Tr. at 1051);

(6) clean vials are commonly used by drug dealers as receptacles for their products (Tr. at 1049–50);

(7) drug dealers commonly use Bearcat scanners, telephone line testers, bug sweepers, and other such devices to maintain security over their operations and to attempt to avoid detection by law enforcement (Tr. at 1060–67);

(8) the presence of high purity narcotics, cutting agents, packaging material such as clean vials, scales, and security devices suggests drug distributions in that location (Tr. 1043–51, 1076–77).

On cross-examination, Sergeant Katz admitted that he had no idea where in the apartments the seized items were found, or their condition at the time they were seized, and that an item's location and condition is highly important in determining whether it is related to or indicative of drug activity. Tr. at 1130. He nevertheless maintained that the seized items indicated drug distribution in the Building. Tr. 1070, 1076–77.

### 3. Special Agent Robert Howen

Robert Howen, a special agent employed in the electronics analysis unit, testified as to the operation and use of scanners and other surveillance devices. Tr. at 931–63. He stated that these items could be purchased at electronics stores, that scanners are frequently used as entertainment, and that books containing frequencies for the police, fire department and other official agencies could be purchased over the counter. Tr. at 963. Special Agent Barbaria had previously testified that HAMC members were always concerned about security and used such devices and information to monitor and secure their operations. Tr. at 228–29.

### B. The Government's Non–Expert Evidence

### 1. FBI Undercover Agent Kevin Bonner

Kevin Bonner, an FBI special agent, testified that from March 1983 through May 2, 1985, he worked undercover, posing as a Baltimore drug dealer interested in purchasing methamphetamine, and later, cocaine from HAMC members. Tr. at 517. Bonner explained that, working with an informant named Vernon Hartung (Tr. at 520), he purchased narcotics from members of nine different chapters of HAMC, including from NYC Chapter members Howie Weisbrod and

Sandy Alexander. Tr. at 530–31. He also purchased over 14 pounds of methamphetamine from a Troy Chapter member, James Harwood, who purportedly obtained his methamphetamine from NYC Chapter members. Tr. at 533–34, 628–29.

Bonner and Hartung used Sandy Alexander's interest in the prisoner of war ("POW") situation in Southeast Asia, and the activities of Colonel Bo Gritz, who had made a foray into Laos to try and rescue POWS, to gain Alexander's confidence and thereby, learn firsthand about the illegal drug activities of the NYC Chapter. Tr. at 55, 638–39. Bonner testified that in his initial meeting with Sandy Alexander, he promised to try and obtain for Alexander information about Colonel Gritz and his activities. *Id.* Bonner also admitted that Hartung spoke to Sandy Alexander on several occasions about gathering information on Colonel Gritz and the POWs, and that on two occasions, they sent Sandy Alexander letters about Bo Gritz. Tr. at 639.

Other than Sandy Alexander acknowledging that he knew of Bonner and Hartung's methamphetamine transactions with Harwood and assuring them that he would step in if they encountered any difficulties with Harwood, Sandy Alexander's only narcotics dealings with Bonner and Hartung involved the sale of cocaine. As for the cocaine sales, Bonner testified that he and Hartung first discussed the sales with Alexander in Alexander's apartment in the Building on November 20, 1984. During that meeting, at which Colette Alexander was present, Sandy Alexander, according to Bonner, specifically offered to sell them cocaine, and stated that he could get them ounces to a pound of Peruvian Flake or Colombian Rock cocaine. Tr. at 577–80.

Bonner further testified that following that meeting, he purchased cocaine from Sandy Alexander on at least four occasions: November 30, 1984, December 19, 1984, January 26, 1985 and February 27, 1985. Tr. at 535. Each of these sales was preceded by telephone calls placed by Bonner or Hartung to Alexander at his residence in the Building for the purpose, testified Bonner, of arranging the four sales. Tr. 585–92, 598–603, 611–14, 619–21. At trial, the Government played a total of eighteen (18) tapes of conversations conducted on Alexander's telephone in the Building. GX 41–58. Fifteen of those conversations were between Bonner or Hartung and Alexander or his wife Colette Alexander. Bonner testified that all fifteen of those conversations, even those to which he was not a party, related to the scheduling of cocaine deals. Tr. 582–623. The three remaining tapes were conversations between Alexander and Jerry Buitendorp, an individual whom Bonner testified supplied Alexander with cocaine. Tr. at 590.

However, in none of the eighteen conversations were there explicit references to narcotics, nor any reference, express or in "code," to price or quantity. Tr. at 584. Bonner testified that Sandy Alexander specifically directed him not to discuss the drug transactions on the phone, but that one day he slipped and used the phrase "cassettes" referring to cocaine. *Id.* Bonner also testified that Alexander told him to use military time to indicate the quantity of cocaine he wanted to purchase and the date he wanted to pick it up (Tr. at 581); however, there were no references to military time in any of the taped conversations with Alexander. Tr. at 658–59. The actual specifics of the deals, including the quantity and price, were worked out in face-to-face meetings at locations outside the Building. Tr. at 593–94. The telephone calls to Alexander only set up a date and time for the parties to meet, and many of the calls did not even accomplish that. In several calls, Sandy Alexander said little more than "I'll call you back" or "call back later." Moreover, no call preceded the final cocaine sale on February 27, 1985. Bonner testified that this was because Sandy Alexander, during an anniversary party in Bridgeport, Connecticut, told Hartung not to use the telephone to arrange the next cocaine deal, but to "send a letter to him." Tr. at 618. Bonner explained that a letter, written in a code suggested by Alexander, was sent to arrange a cocaine sale for February 26, 1985 (Tr. at 618–23), but Sandy Alexander misunderstood the purported code, and thought the sale was to take place the next day. Tr. at 659–60.

### 2. Cooperating Witness Robert Banning

Also testifying on behalf of the Government was Robert Banning, a former member of the Bridgeport, Connecticut Chapter of HAMC and an admitted former heavy cocaine user. Tr. at 846. Banning testified that he witnessed members of the NYC Chapter of HAMC distributing methamphetamine in the Building during his various visits to the club. Tr. at 789, 793, 796. Particularly, he described coming to· New York in April 1985 for a Willie Nelson concert and attending a party, supposedly held in Paul Casey's apartment in the Building, at which drug sharing was rampant. According to Banning, he went into a second floor apartment in the Building, the home of Paul Casey or an individual named "Ted," and asked Casey for some methamphetamine. Banning testified that Casey pulled a Ziploc bag filled with over a pound of methamphetamine from a garbage bag in the corner of the room and gave him some. Tr. at 804–05. Some NYC Chapter HAMC members also used methamphetamine that Casey had placed on a mirror on a coffee table. Tr. at 805. NYC Chapter members, according to Banning, also helped themselves to some of his cocaine. Tr. at 806.

On cross-examination, when asked to describe Paul Casey's apartment, Banning testified as follows:

Q. Can you describe Paul Casey's apartment at 77 East 3rd Street?

A. I don't believe so.

Q. How many rooms did it have, do you recall?

A. I walked in the door; he was sitting on a couch. I was loaded on cocaine. I didn't go no further than there and back out the door.

Tr. at 846–47. Banning also testified, however, that the first thing he saw walking through the door was a couch in front of a coffee table, that the door opened directly into a room, and that he could not remember if there was a kitchen in the apartment. Tr. at 850.

Banning's description of Paul Casey's apartment differed significantly from a photograph of the apartment taken during the May 2 raid, and from the description offered by FBI Special Agent Richard Demburger, who led the FBI team that searched Paul Casey's apartment during the raid. Agent Demburger testified that upon entering the front door of Paul Casey's apartment, you turned down a hallway, and "then you encounter[ed] this kitchen area from which you c[ould] make a left-hand turn into another broader, bigger room which is like a living room and loft bedroom area." Tr. at 1206. Banning did not mention the loft area—a prominent and conspicuous part of Casey's living room.

### 3. Other Evidence

The Government also presented Stipulations of Fact that eleven members of the NYC Chapter of the HAMC pled guilty to or were convicted of participating in a conspiracy to manufacture and distribute methamphetamine during the period 1982 continuously up to and including May 2, 1985. However, the Government proffered no admission by a NYC Chapter HAMC member that this methamphetamine conspiracy emanated from or was otherwise tied to the Building.

## II. The Probable Cause Finding

At the close of the Government's direct case, I concluded that the Government had established probable cause to support forfeiture of the property in that the Government had demonstrated a "nexus" between the Building and narcotics felonies. See United States v. All Right, Title and Interest in Real Property and Appurtenances Thereto Known as 785 St. Nicholas Avenue and 789 St. Nicholas Ave., 983 F.2d 396, 403 (2d Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 2349, 124 L.Ed.2d 258 (1993). My determination was based on the expert testimony concerning the items seized from the Building during the May 2, 1985 raid in combination with the testimony that HAMC members of the NYC Chapter continuously used methamphetamine outside of the Building during the relevant time period, and undercover agent Kevin Bonner's description of his discussions with Sandy Alexander in the Building to arrange future cocaine sales.

I did not, however, find that the Government had shown probable cause that non-personal use of narcotics had occurred in the Building during the relevant time period, despite the Government's expert testimony that NYC Chapter HAMC members engaged in a "party lifestyle," where narcotics sharing was rampant, and indeed, integral to their lives. The only direct evidence of any drug sharing in the Building during the relevant time period came from Robert Banning, whose description of Paul Casey's apartment, where he claimed to have witnessed large quantities of methamphetamine being shared, was substantially contradicted by a photograph of the apartment and Agent Demburger's testimony. In light of these contradictions, Banning's admitted lapses in memory and intoxication on the night in question, and the fact that the Government offered no corroborating evidence that a Willie Nelson concert had occurred at all during the relevant time frame, I found Banning's testimony concerning the location of the drug sharing party he purportedly attended in April 1985 less than reliable, and I, therefore, discredited it.

## III. *The Claimants' Case*

■ After I found probable cause, the burden of proof shifted to the claimants to demonstrate either that the Building was *not* used unlawfully, or that its illegal use was without the claimants' knowledge or consent. *See United States v. Property at 4492 S. Livonia Rd., Livonia*, 889 F.2d 1258, 1267 (2d Cir.1989); *785 St. Nicholas Avenue*, 983 F.2d at 403 (2d Cir.1993). To meet their burden, claimants presented deposition testimony of Vernon Hartung, the informant who, along with Kevin Bonner, purchased cocaine from Sandy·Alexander, and live testimony from Colette Alexander and Paul Casey. The claimants also introduced into evidence some of the items seized from Paul Casey's apartment during the raid, namely the scale, an owner's manual for a scanner, and some of the books containing police and fire frequencies.

### A. *Vernon Hartung's Deposition Testimony*

In contrast to Agent Bonner's testimony, Vernon Hartung testified that Sandy Alexan-der, in the November 20, 1984 meeting with Hartung and Bonner in Alexander's apartment, spoke only generally about cocaine.

Q. Did you discuss drugs with Mr. Alexander in his apartment on that occasion?

A. Yes, basically we did discuss a little bit. I am remembering back on it, and it pertained to about if we ever needed any more drugs, he could get the drugs for us.

Q. Did he say what kind of drugs?

A. He could get us anything, cocaine, crank, he can get us by the pound whatever we need. Let him know, he can get it.

Hartung Dep.Tr. 278.

Hartung testified, however, that no specific arrangements to purchase cocaine were made during that meeting (Hartung Dep.Tr. at 211–12), and that the actual details of the first cocaine deal were worked out at a later meeting in a restaurant in New York. *Id.* at 170–71. Hartung corroborated Bonner's testimony that Sandy Alexander during that the November 20 meeting told them to stay away from heroin, that Hartung had brought Alexander Vietnam handkerchiefs in which Alexander had an interest and that the three discussed several topics. *Id.* at 135–36.

### B. *Colette Alexander*

Colette Alexander admitted that drugs had been a large part of her life as well as that of several members of the HAMC and their "old ladies," i.e., girlfriends or wives. Tr. at 1318–19, 1341–42. She also admitted observing HAMC members sharing methamphetamine at club parties, and to having shared methamphetamine with Paul Casey's wife, Hope Casey, in their respective apartments in the Building. Tr. at 1341–42. She claimed, however, that her narcotics use and involvement in club activities declined significantly after her son Erik was seriously injured in an accident on April 8, 1982. Tr. at 1303–07. She further testified that her life revolved around her son after his accident, and the she lost interest in drugs and in the HAMC generally. Finally, she admitted

meeting Bonner and Hartung on November 20, but denied being present during most of their discussions with her husband. Tr. at 1393–1401.

As for the items seized from her apartment during the May 2 raid, Colette stated that she used the grinder on occasion to grind rocks of cocaine, and that she believed the purported cutting agents to be Sandy Alexander's "protein" powders. Tr. at 1314–15. However, on cross-examination, the Government introduced her deposition testimony where she claimed that she occasionally used those substances to "cut" or dilute her personal stash of methamphetamine. Tr. at 1350–51.

### C. Paul Casey

Paul Casey testified that he joined the NYC Chapter of HAMC in August 1970. Tr. at 1427. At that time, he worked as a journeyman carpenter and was a member of the New York Carpenters Union. Tr. at 1428. He also testified that other members of the NYC Chapter, including Sandy Alexander and Howie Weisbrod, held jobs as diverse as stuntman, motorcycle mechanic, welder, professional boxer, bodyguard, tunnel diggers, video shop owner and truck driver. Tr. at 1440–53.

### 1. The NYC Chapter's Methamphetamine Manufacturing and Distribution Enterprise

Casey admitted manufacturing methamphetamine from the middle of 1978 to the spring of 1984. Tr. at 1494–1511. According to Casey, sometime in mid–1978, Howie Weisbrod told him that he had a contact who could supply them with P2P—the main ingredient in methamphetamine. Tr. at 1495. Sandy Alexander provided Casey with a formula for manufacturing methamphetamine, and Casey began producing the drug. Tr. at 1497.

Casey described the multi-stage manufacturing process, and stated that it took him some time to perfect it. Tr. at 1497–99. He also described some of the tools he used in the process, which included a triple beam Ohaus scale, similar to one of the scales seized from 87 East 3rd Street, to weigh the various component chemicals and substances he used in manufacturing large quantities of methamphetamine. Casey denied ever having used the scale seized from his apartment in his methamphetamine production. Tr. at 1506. He stated that this scale, a rather small scale [sometimes used by dieters to weigh small portions of meat or other food] with no weight markings or gradations, was just for decoration, although it was sometimes used as an ashtray. Tr. at 1506–07.

Casey emphatically denied ever manufacturing methamphetamine in the Building (Tr. at 1502, 1567–68), and listed a series of locations in Staten Island and Connecticut where he set up his manufacturing operations. Tr. at 1502–04. Casey also denied ever storing commercial quantities of methamphetamine in the Building, but admitted maintaining personal use amounts there on occasion. Tr. at 1567–68. He did, however, state that he stored an ounce of methamphetamine in his shop at 87 East 3rd Street. Tr. at 1568.

According to Casey, half of the methamphetamine he produced went to Weisbrod's P2P supplier, and the other half to Weisbrod. Tr. at 1509–10. Weisbrod then would distribute the methamphetamine to NYC Chapter members, who then would sell it, returning some of the profits to Weisbrod. Sandy Alexander, according to Casey, did not play much of a role in the methamphetamine enterprise, other than providing the initial formula. However, Sandy Alexander was given some of the profits from the methamphetamine enterprise to help pay for his activities on behalf of the club, and to compensate him for providing the formula. Tr. at 1510. Although admitting that the methamphetamine enterprise subsidized the income of NYC Chapter HAMC members, Casey stated that he, Weisbrod and Alexander did not want the chapter involved in dealing large amounts of methamphetamine for sales greater than necessary to pay basic living expenses.

Q. Do you recall that there was a rule imposed by the [Weisbrod–Casey–Alexander] group that members of the New York City Chapter had to come to Mr. Weisbrod in order to obtain methamphetamine during the period 1979 to '84?

A. I wouldn't say it was a rule. It was something where we didn't want anybody—we didn't want—we were aware of the fact that methamphetamine is something you don't see in New York. It's something you don't see in the East Coast. We didn't want to see a lot of it out here.

We didn't want to see any of it out, we just wanted enough to get our rents paid and that was it. Nobody was looking to get rich here. In reality, if a person wanted to sell methamphetamine, there was people lining up for half a mile.

That wasn't the intent here. We purposely did not want people in the drug business per se. What went on in this case, it looks to us like Mr. Bonner went around offering people money and they went out and found the drug. . . .

Tr. at 1667.

The NYC Chapter's methamphetamine business ended, according to Casey, in the spring of 1984. Casey testified that he stopped manufacturing the drug after Weisbrod's P2P source dried up, and personal problems took him away from New York City and the club for extended periods of time. Tr. at 1511–13. In fact, the minutes of church meetings confirm Casey's repeated absences from club meetings commencing in the spring of 1984 and thereafter.

Casey further testified that his failure to attend the April 1 run had led the NYC Chapter members to consider throwing him out of the club. Tr. at 1515–16. Indeed, according to Casey, his "patch" was suspended for a period of time. Tr. at 1516. Ultimately, however, Casey decided that he did not want to leave the club, moved back to New York and resumed his life as an active member of the NYC Chapter. Tr. at 1516–17. His methamphetamine production, however, ceased.

A. We were out of business. Howie had no more P2P. I really didn't particularly care for doing it anymore, even if he did.

Tr. at 1642–43.

That did not, however, prevent Casey from distributing methamphetamine. Casey testi-fied that he sold methamphetamine to Jimmy Canestri sometime in the summer of 1984 from his shop at 87 East 3rd Street, down the street from the Building (Tr. at 1640), and admitted that he pled guilty to distributing methamphetamine to someone at his shop on or about May 2, 1985. He also admitted occasionally giving a "snort" of methamphetamine to people after he ceased manufacturing the drug in the spring of 1984. Tr. at 1641.

### 2. The NYC Chapter Rules Regarding Narcotics

During his testimony, Casey described the NYC Chapter's long history with the Building and the special care and attention club members paid to maintaining and repairing the Building and protecting it from association with illegal activities. Casey also testified about certain NYC Chapter HAMC rules regarding drugs, which included prohibitions against bringing commercial quantities of narcotics into the Building and sanctions for abusing drugs.

A. Well, there were club policies regarding drugs; you couldn't inject a drug.

Mr. Sipioria: Time period please?

A. That was from day one; you couldn't inject a drug. From day one, no drugs in the building; that's from day one.

Q. When you say the building, do you mean the entire building at 77 East 3rd Street?

A. I mean the entire building.

Q. Does that refer to personal use amounts or to commercial amounts?

A. That would refer to commercial amounts.

Q. There was no, I take it, club policy regarding personal use of substances in the building?

A. No, so long as nobody was abusing.

Q. What would occur if somebody in the view of the club began to abuse a substance, whether an illegal substance or alcohol?

A. They would be told about it.

Q. If they continued to abuse it, what would happen?

A. They would either be told again or be brought up to be 86'd from it.

Q. What does that mean?

A. That would mean you are forbidden to use it any longer.

Q. In the minutes—

A. That's an absolute.

Q. What would happen if you violated an 86?

A. They would kick you out. As far as the club would be concerned, you are [sic] taking that drug means more to you than membership in the Hells Angels Motorcycle Club.

Tr. at 1518–19. Casey further testified that an HAMC member could be "86'd" from using drugs or alcohol only by a vote of the membership. He described various instances, reflected in the minutes, where members had been "86'd" from using certain drugs or alcohol or where motions had been made that such action be taken. Tr. at 1519, 1520–21, 1523–28.

Casey also testified that the entire club was "86'd" from using methamphetamine in October 1984, and that the "86" was not removed prior to the raid. Tr. at 1528–30. Although the "86" on members' use of crank was enforced on an honor system, NYC Chapter members, according to Casey, took it seriously.

Q. What would happen if a member was seen by another member using crank after that point in time?

A. He would, what would be done, that person would, I don't know what an individual would do, I know what would have to be done. It would be brought up in the meeting, this guy is breaking the 86. It would be brought up to the individual, when he did it, you know; you have an 86, you have an 86. You would be brought up, thrown out of the club. Whether or not the club would throw him out, I can't say positively he would be. It would depend on the circumstances.

It's not an acceptable behavior. It's an absolute. You don't do it; it's not done. We have rules within our group that you abide by. There are not that many rules. We don't restrict people from living their own lives. There are certain rules you have to abide by.

Q. Would you operate based on an honor system?

A. Absolutely.

Q. I take it from that point in time, a member would be careful not to use crank in the presence of another member?

A. I would take it from that point in time a person wouldn't use crank period, or hit the road.

Tr. at 1530–31.

Casey did admit, however, that this "86" did not prohibit members from distributing speed, just using it. Tr. at 1685–86.

### 3. *The Physical Evidence Seized from His Apartment*

Casey also testified that many of the items, including the scale, seized from his apartment during the May 2, 1985 raid were not used in or related to any drug activity. The small oilcan, a gift, was merely a can and did not contain a false compartment; it, according to Casey, was a false compartment only if one "look[ed] at the can as being a false can." Tr. at 1508. He denied ever having stored methamphetamine in the oilcan. *Id.* As for the Bearcat scanner, Casey claimed that it could not monitor any sensitive law enforcement activities, and that he used it merely for entertainment. Tr. 1565–66. He further claimed that the alleged telephone tester was a portable phone. Tr. at 1737.

### 4. *The NYC Chapter's "Party Lifestyle"*

On cross-examination, when questioned about the "party lifestyle" of the NYC Chapter of HAMC, Casey denied Barbaria's contention that methamphetamine was passed writ large at NYC Chapter parties.

Q. Well, did you see that reality there? Did you ever see members passing drugs during parties?

A. At one time or another, I'm sure I have. To tell you a date or time, that would be—it wasn't a common practice.

*If anybody had any speed, they didn't want to share it in the first place.*

Q. Well, when you saw members passing drugs in this building, did you make any attempt to stop that activity?

A. It wasn't a common practice to pass drugs in the building and it wasn't a thing that was done on a common basis. Has it ever happened? I wouldn't doubt that it did. But, I mean, this isn't a common practice. Whether or not someone ever passed another person a joint in the course of a party and they took a puff of marijuana, I mean, let's be realistic.

Tr. at 1623. (Emphasis added).

Moreover, Casey stated that NYC Chapter parties were generally held outside the Building, and that there were no Chapter parties held in the Building during the relevant time period. Indeed, the only parties Casey remembered in the Building during the relevant time period were parties for his two children, Christopher and Cassidy, who respectively, were nine and six years old at the time of the May 2 raid. Tr. 1436, 1681.

Q. But, Mr. Casey, what I'm asking you is not whether there were parties outside, I'm asking you whether there were parties that took place in the building from the period '80 to '85?

A. Was there ever one? I'm sure there was.

Q. And there were parties in the time period '84 to '85 as well, weren't there?

A. Parties. Now we're plural. In one year period? I don't know if I would agree with you on that. You'd have the Fourth of July party took place outside. You're using you know—I'm not trying to be rude to you. Fourth of July party took place outside. That's an outside block party that we have for the people in the area and the poor kids who don't have any money that want to have fun on Fourth of July.

And what else is there? There's an anniversary party we'd have in December, and that we'd rent a place. The April 1 run we'd be off on the road. On other runs we are on the road.

Q. So—

A. You know, the day of people hanging out in the clubhouse is—that changed when everybody got their own apartments per se.

Q. So you deny that there were parties in this building, 77 East 3rd Street, during the period October '84 to the time of the raid, May '85?

A. I can't put my finger on any party in specific, although I'm sure I had a party for Chris and Cassidy, who were both born in the month of March.

Tr. 1680–81.

In the same vein, Casey had also testified:

Q. . . . Were there parties in that building from '80 to '85?

A. What type of party? I mean, I've had parties for my children for their birthday.

Q. Parties involving members of the New York City Chapter of the Hells Angels.

A. Generally a party would take place, such as anniversary party, at a place other than the clubhouse. The clubhouse was too small.

Tr. 1679–80.

### III. *The Government's Rebuttal Evidence*

Initially, the Government intended to call William "Wild Bill" Medeiros, a founding member of the NYC Chapter of HAMC, a past NYC Chapter president and the only witness with direct knowledge of what occurred or did not occur in the Building during the relevant time frame, to rebut the claimants' case. However, Medeiros suffered numerous heart seizures during the trial and never recovered sufficiently to testify.

Instead, the Government called Sandy Alexander, who invoked the Fifth Amendment in response to over one hundred questions, including those inquiring into the manufacture and distribution of methamphetamine by NYC Chapter HAMC members. Alexander did, however, admit that he acted as a middleman for the cocaine supplier Jerry Buitendorp in selling cocaine to FBI Agent Kevin Bonner and Vernon Hartung. Alexander admitted but recalled only three, not four, sales of cocaine to Bonner. Tr. at 2063.

Although Alexander did not deny meeting Bonner and Hartung in his apartment on November 20, 1984, he denied arranging the sale of cocaine during that meeting. Tr. at 2066. He also testified that the main topic of discussion during that meeting was the activities of Colonel Bo Gritz and POWs in Southeast Asia. Tr. 2066.

Alexander also testified that Bonner and Hartung called him incessantly, remarking that had he had a beeper, they "would [have] beep[ed] [him] to death." Tr. at 2073. He claimed that he never told the two to stop calling him at home because "they were trying to help [him] with the Prisoners of War thing." Tr. at 2070.

## IV. *The Jury's Verdict and the Instant Motion*

I charged the jury on January 31, 1994. Four days later, on February 4, 1994, the jury returned a verdict in favor of the claimants, finding that the claimants had proven, by a preponderance of the evidence, that the Building had not been used to commit, or facilitate the commission of, a felony drug violation between October 12, 1984 and May 2, 1985. Having so found, the jury did not reach claimants' "innocent owner" defenses of lack of knowledge and lack of consent.

The Government thereafter timely filed the instant motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) or alternatively for a new trial pursuant to Fed. R.Civ.P. 59(a).

## DISCUSSION

### I. *The Motion for Judgment as a Matter of Law*

#### A. *The Rule 50(b) Standard*

■ In this Circuit, a district court may grant a Rule 50(b) motion for judgment as a matter of law only if, "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Samuels v. Air Transport Local 504*, 992 F.2d 12,

14 (2d Cir.1993) (citation omitted). Hence, judgment as a matter of law is inappropriate unless there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]." *Id.* (quoting *Mattivi v. South African Marine Corp., Hugvenot*, 618 F.2d 163, 168 (2d Cir.1980)). In deciding a Rule 50(b) motion, a court may not weigh conflicting evidence, assess the credibility of witnesses, or substitute its judgment for that of the jury. *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57 (2d Cir.1993).

■ Moreover, in assessing post-trial motions for judgment as a matter of law, district courts apply the same standard used in assessing whether factual issues exist as used in reviewing summary judgment motions under Fed.R.Civ.P. 56. *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir.), *cert. denied*, 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272. Consequently, more than a mere "metaphysical doubt as to the material facts" must exist to defeat judgment as a matter of law, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); the party opposing the Rule 50 motion must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A complete failure of proof on an essential element of the nonmoving party's case, and on which such party bears the burden of proof, renders all facts immaterial and entitles the movant to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

#### B. *The Evidence Supporting the Jury's Verdict*

The Government contends that the evidence presented at trial amply demonstrates its entitlement to judgment as a matter of law. First, the Government maintains that both Colette Alexander and Paul Casey "admitted 'sharing' or 'passing' undefined small

amounts of methamphetamine and/or cocaine in the Building." Plaintiff's Memorandum of Law ("Pl.Mem.") at 12. Second, the Government argues that Sandy Alexander and his counsel in summation conceded that Alexander used his apartment in the Building, particularly his telephone, to arrange the four cocaine sales to undercover agent Bonner. Third, the Government argues that the claimants failed to rebut the "overwhelming physical evidence proving that individual tenants used the Building to sell narcotics." Pl.Mem. at 3. Each of these contentions will be addressed in turn.

### 1. Claimants' Purported Admissions that Narcotics were Shared or Passed in the Building during the Relevant Time Period

■ Before addressing the purported admissions of drug sharing, I must first clarify a point the Government obscures in its brief. The claimants had no burden to prove that drug sharing did not occur in the Building during the relevant time period since my finding of probable cause was not based on any such drug sharing. In finding probable cause, I discredited Robert Banning's testimony that he witnessed methamphetamine and cocaine being shared in Paul Casey's apartment since (1) his description of Paul Casey's apartment conflicted dramatically with that of the FBI agent who raided the apartment, (2) he confessed to being prone to memory lapses because of past heavy drug use, (3) he admitted being "high" on the night in question, and (4) there was no corroborative evidence of club members attending a Willie Nelson concert in the Spring of 1985. The Government offered no other direct evidence of drug sharing in the Building during the relevant time period, and I limited my probable cause finding to the methamphetamine conspiracy the Government alleged was operated out of the Building, and Sandy Alexander's cocaine transactions which the Government claimed were facilitated by the November 20 meeting in the Building and the telephone calls to the Building. Thus, the claimants had no obligation to affirmatively disprove that drug sharing occurred.

■ Forfeiture would have been compelled as a matter of law if, as the Government contends, the claimants admitted that methamphetamine and cocaine had been shared in the Building during the relevant time period, since the sharing of any amount of these substances constitutes a distribution. *See United States v. Corral–Corral,* 899 F.2d 927, 936 n. 7 (10th Cir.1990); *United States v. Brown,* 761 F.2d 1272, 1278 (9th Cir.1985); *United States v. Ramirez,* 608 F.2d 1261, 1264 (9th Cir.1979). However, none of the testimony the Government cites rises to the level of a clear admission of drug sharing in the Building during the relevant time frame of October 12, 1984 to May 2, 1985.

### a. Colette Alexander's Testimony

Colette Alexander unquestionably admitted "sharing" drugs with either the wives or girlfriends of HAMC members or the members themselves in the Building. *See, e.g.,* Tr. at 1318–19, 1341–42, 1351–52. It is also undisputed that Ms. Alexander testified she observed HAMC members sharing and passing methamphetamine in the Building. Tr. at 1356–57.

She did not, however, admit that she or others distributed, shared or passed narcotics *in the Building during the relevant time frame.* This critical omission is highlighted in the very testimony the Government claims mandates forfeiture of the Building as a matter of law:

Q: Now, you said that after Erik's accident [in 1982] you did less visiting amongst your friends and tried to spend more time in the house, right?

A: Yes.

Q. However, the other people who lived in the building, sort of community of people, continued to visit each other as they had before, correct?

A. I really don't know. I suppose so.

Q. But you have no reason to think that any of their pattern of behavior had changed in any way up to the time of the raid?

A. Well, actually, I'm not sure what year it was, but Hope and Casey had a third child, I think his name was Michael, and

he died before his first year of infant syndrome. I know that affected them greatly also.

Q. In terms of practices of the Hells Angels community, the sharing of drugs and the partying that they occasionally did, as you said?

A. I'm sure nothing changed in pattern that way.

Tr. at 1420–21.

This testimony does not definitively place any drug activity by NYC Chapter HAMC community members within the relevant time period or in the confines of the Building. At most, it establishes that some drug sharing occurred, somewhere, after April 8, 1982, when Alexander's son, Erik, was injured in an accident. This certainly permits but does not compel a jury to infer that HAMC members distributed drugs in the Building during the relevant time period.

Nor does the following testimony by Alexander compel the conclusion that she and Hope Casey shared narcotics in the Building during the relevant time period:

Q. There was nothing that occurred in 1984 to change that relationship between you and Hope; you could still freely go back and forth and say, do you have a little something, on occasion?

A. I don't know.

Q. From 1984, from 1983, from 1982, from 1985?

A. I don't know.

Q. My question is not specifically recalling an incident; did anything change your relationship with Hope?

A. Only thing in my life was my son, and my relationship with everybody had changed from that point on.

Q. After Erik's accident, you still had a relationship with Hope; you would stop in her house, she would stop in yours, you would pass crank?

A. I am sure it was.

Tr. at 1342. Alexander's rather cryptic statement "I am sure it was" does not squarely place any narcotics sharing between her and Hope Casey in the relevant time period, particularly, given Alexander's inabil-

ity to recall any such sharing from 1982 to 1985. Moreover, given the Government's compound question regarding her relationship with Hope Casey after Erik's accident and the passing of crank, a jury reasonably could have taken Alexander's remark as simply an affirmation that she continued to have a relationship with Hope Casey after her son's accident. The jury certainly was not compelled to conclude that Alexander and Hope Casey shared methamphetamine in the Building sometime during October 12, 1984 to May 2, 1985.

As the above portions of Colette Alexander's testimony illustrate, the Government did not, as it contends, elicit a definitive admission from her that she witnessed or participated in drug sharing in the Building during the relevant time period. Forfeiture is not, contrary to the Government's assertions, compelled on the basis of Ms. Alexander's ambiguous testimony.

### b. *Paul Casey's Testimony*

■ Nor does Casey's testimony, which the Government admitted at trial was the "only thing that stood between the Building and forfeiture," mandate forfeiture of the Building. Paul Casey admitted observing, "[a]t one time or another," HAMC members passing drugs during parties in the Building (Tr. at 1623), and sharing methamphetamine with his wife Hope and others in the Building prior to 1984. Tr. at 1685. Casey also admitted to distributing methamphetamine in the spring of 1985, however, those distributions occurred *outside* of the Building at 87 East 3rd Street. Tr. at 1788, 1797. Similarly, Casey also admitted distributing methamphetamine from 87 East 3rd Street on or about May 2, 1985, while on guard duty. Tr. at 1795–97.

However, the Government has not pointed to a single admission by Casey that establishes a distribution of narcotics *in the Building during the relevant time period.* Casey testified that he did not "throw away" his stash of methamphetamine after an October 1984 Church of Angels resolution barred all HAMC members from using methamphetamine because his wife "Hope would take some now and then if she wanted some" or

"somebody else would want some." Tr. at 1803. Nothing in Casey's testimony indicates that this leftover "stash" of methamphetamine, however, was kept in the Building, or that he made any distributions of those drugs there. To the contrary, that Casey had to go to 87 East 3rd Street to distribute methamphetamine to an individual who had just completed working at the Building on May 2 suggests that he kept his leftover methamphetamine at 87 East 3rd Street and distributed it from that location.

Not only did Casey fail to admit that narcotics activity occurred in the Building during the relevant time period, he affirmatively stated that no such activity was ever allowed in the Building. Casey discussed the club rule against drugs in the building, which prohibited all drugs except those for personal use. He also stated that most club parties occurred outside the Building at restaurants or outdoors, and that in the relevant time period, the only parties in the Building he recalled were for his children's birthdays. As for the methamphetamine conspiracy, he testified that it ended in summer 1984, and that in October 1984 all members were banned from using the drug.

 Recognizing the ambiguous and indefinite nature of Casey's and Alexander's purported "admissions" of methamphetamine distribution in the Building during the relevant time period, the Government asserts that their "conspicuous failure to deny such distributions (and, indeed admitting the possibility that they occurred) fails to create a disputed issue of fact on this point." Pl. Mem. at 19. Nothing could be further from the truth, however, since the claimants had no burden to affirmatively disprove contentions the Government had failed to establish in its probable cause showing and which were not clearly admitted in the testimony upon which the Government relies. Therefore, the Government has not borne its initial burden of demonstrating the absence of a genuine issue of fact on the question of drug sharing in the Building during the relevant time frame.

### 2. Sandy Alexander's Cocaine Transactions

The Government next argues that judgment as a matter of law is compelled in this case because the claimants failed to rebut (1) Agent Bonner's testimony that Alexander agreed to sell him and Vernon Hartung cocaine in their initial meeting in Alexander's apartment on November 20, 1984; and (2) the evidence that Alexander used his phone in the Building to arrange the four cocaine sales to Bonner and Hartung. The Government also contends that counsel for the Alexanders, in her summation, conceded that Alexander offered to sell Bonner cocaine during their November 20 meeting in the Building (Tr. at 2235), and that "the calls that preceded the sales certainly had something to do with drugs." Tr. at 2307–08.

Although the Government's arguments concerning Sandy Alexander's cocaine transactions and the use of the Building to arrange them are more compelling than its drug sharing contentions, they are, nonetheless, unconvincing.

### a. The November 20, 1984 meeting in the Building

Agent Bonner testified that during the November 20, 1984 meeting in Sandy Alexander's apartment, Sandy Alexander agreed to sell cocaine to him and Hartung. Specifically, Bonner stated as follows:

Q. Did you have any discussions with Mr. Alexander regarding narcotics?

A. Yes, I did.

Q. What was discussed in the area of narcotics?

A. In the area of narcotics, I told Mr. Alexander that I was having a very successful business in Baltimore selling cocaine and methamphetamine, Vernon Hartung and I were doing very lucratively in the business. I told him I was thinking we could do it with regard to drugs for the Hells Angels, to let me know, because I was in a real good financial situation at that time.

Q. What did Mr. Alexander say in response?

A. He told me he didn't want to interfere with any business Gorilla, James Harwood, and I were doing at the time.

Q. What did you say in response?

A. I told him Gorilla and I were only doing a methamphetamine business at that time and not cocaine.

Q. Did Mr. Alexander say anything in response?

A. Yes, he did.

Q. What did he say?

A. He told me that in terms of cocaine, that he could get cocaine, he could get any amount, from ounces to a pound of cocaine he could get for me.

Q. Did he offer to sell cocaine to you?

A. Yes.

Q. What did you say in response?

A. I told him I would be interested in purchasing cocaine from him if he got good quality cocaine, that I would purchase up to ½ pound the first time, I wanted to see how good the stuff would be first.

Q. Did he describe the type of cocaine he would get for you?

A. Yes, he did.

Q. How did he describe it?

A. He described it as Colombian Rock or Peruvian flake.

Q. In terms of quantity, did he represent any particular quantity that he would provide?

A. He said from ounces up to a pound.

Q. Did you discuss obtaining cocaine from him?

A. Yes, we did.

Tr. at 579–80.

However, Vernon Hartung, in his deposition, cast doubt on Bonner's rendition of the conversation in Alexander's apartment on November 20, 1984. While Hartung confirmed Bonner's testimony that drugs were discussed during that meeting, he stated that cocaine was discussed only in the most general terms. Hartung testified as follows in his deposition:

Q. Okay. How did you arrange to meet Sandy Alexander at this apartment?

A. We made initial phone calls after the 4th of July thing, for example, kept contacting them, and Kevin Bonner and I went up to visit him. We told him we were coming up, he said stop up and see him. And I brought some stuff up for him, handkerchiefs, and Vietnam stuff, he wanted handkerchiefs. And Kevin and I went up there to see him. We had a conversation, we told him that we had been doing real good. He said I heard how you guys are doing real good right now. We said yes, we are looking to buy some heroin. He said don't be fooling with heroin, he said no club member fools with heroin, you don't want to get involved with that.

Q. This is not the conversation in his apartment?

A. Yes, this is in his apartment.

Q. Okay.

A. And he said he would give us a call sometime, if I get—he said I can get some real good stuff, you know, I don't remember the exact words word for word, and Kevin was present the whole time. I said well, we will do that. But he said don't fool around with no heroin. We left there, there was no more conversation with Sandy pertaining to this, and I cannot recall what date it was, but we received a phone call from Sandy to come and see him, and we was going to meet him somewhere, pertaining to he can get us some cocaine, it was. And that's exactly what happened.

Hartung Dep. Tr. 135–36.

Later in his deposition, Hartung testified:

Q. Okay. When is the first time you had a conversation with Sandy about buying drugs?

A. That was the time when he had mentioned we wondered about heroin, he said no. There was another time we had talked to him, we went up, it may have been four occasions. It wasn't at the clubhouse, it was outside, I am talking about inside his apartment, and we were in New York, and *he said, you know, I got a line on some good stuff. He said I will get back with you in a couple of*

*weeks* and it was approximately two weeks, it may have been three at the most, that he did get back with us. But we went back to New York to buy the drugs, and Kevin and him talked price stuff, I don't remember exactly how much it was. But we didn't meet at the clubhouse, when we went back to New York, we met in a restaurant.

Q. *Where did the—the conversation that you just described—*

A. *In front of the clubhouse.*

Q. So when he said to you, I have a line on some good stuff—

A. Yes.

Q. —that occurred outside?

A. Yes, best of my recollection, it was outside, yes.

Hartung Dep. Tr. 170–71. (Emphasis added).

Expressly denying that any specific arrangements to purchase cocaine were made during the November 20 meeting, Hartung further testified:

Q. There were no specific arrangements made at the time you were in Sandy's apartment?

A. No.

Q. In fact, he didn't have any—he indicated that he did not have any at that time?

A. No, he said he would have some coming.

Q. Okay. But that's the full extent of what he said?

A. Yes. Best I can recall.

Q. Okay. And that's the only conversation about drugs you had with him on that occasion?

A. On that occasion.

Hartung Dep. Tr. 211–12; *see also id.* at 202 ("[t]hat was set up in the apartment, the drug deal, *that he could get some stuff, but the actual meeting place and stuff was discussed over the phone,* and the first one was done in a restaurant").

▆ Thus, in Hartung's version of the November 20, 1984 meeting, Sandy Alexander only generally assured them that he could obtain "real good" cocaine for them.

Hartung's testimony corroborates Sandy Alexander's testimony that he did not arrange to sell cocaine to Hartung and Bonner during their November 20, 1984 meeting with him in their apartment. Tr. at 2065–66. Therefore, no specific agreement to transact a cocaine sale was reached during that meeting. Nor was price, quantity or type of cocaine discussed. Indeed, according to Hartung, the parties did not even arrange or schedule a future meeting. Sandy Alexander's general assurances that he had access to cocaine, as described by Hartung, is hardly tantamount to negotiating or arranging a specific drug transaction. *Cf. United States v. Ruiz,* 932 F.2d 1174, 1184 (7th Cir.1991) (defendant's comment that he could get ten kilograms of cocaine was "hardly the negotiation of a specific drug transaction" and did not demonstrate, by a preponderance of the evidence, that defendant agreed to sell ten kilograms of cocaine for purposes of sentencing).

Indeed, Alexander's assurances during that meeting are qualitatively indistinguishable from those he allegedly made in an earlier conversation with Bonner regarding methamphetamine, which I found failed to establish even a "nexus" to the Building that would justify a finding of probable cause. Bonner testified that on July 4, 1984, Sandy Alexander told him, in the clubhouse, that if James Harwood, Bonner's methamphetamine supplier was convicted on drug charges, he should come see Alexander and he would "arrange something." Tr. at 558. I rejected the Government's argument that probable cause as to the methamphetamine conspiracy could be based on that conversation alone because of the general nature of Sandy Alexander's comments. Specifically, I stated:

> It still goes in the category of … assurances. It is not actually setting up the deal, it is not delivering on the deal, what it is is a promise, if you don't get delivery in the future from Harwood, I'll step in. There's no agreement of any kind being discussed during that meeting. There is merely a recognition that something has occurred and that I will step in if something else doesn't occur. I would not consider that a nexus sufficient to create grounds for forfeiture standing alone.

Tr. at 1228–30. Sandy Alexander's general statement, as testified to by Hartung, that he could get "good stuff", *i.e.* cocaine, similarly falls into the category of mere "assurances." Therefore, crediting Hartung's testimony, a reasonable jury could have concluded that Alexander's apartment did not facilitate his later cocaine sales to Bonner and Hartung, as the November 20, 1984 conversation therein was only tangentially linked to Alexander's later cocaine sales.

### b. *The Telephone Calls to Sandy Alexander's Residence in the Building*

▮ Though they present a closer question, the telephone calls from Bonner, Hartung and Jerry Buitendorp to Alexander's residence in the Building do not, as a matter of law, require forfeiture of the Building. Before turning to the substantive legal issues raised by the phone calls, it is useful to first place the calls in context. Although the Government's brief spins a tale of numerous calls to arrange drug transactions, with the parties speaking in code to elude suspicion, the tapes themselves, which the jury heard, depict a far less compelling yarn.

First, as stated before, there was not a single explicit reference to cocaine, or price or quantity in any of the alleged 18 calls to arrange drug deals. Second, many of the calls were innocuous, or arguably related to other projects which the parties were involved in, namely obtaining information about the POWs and Colonel Gritz's operations in Southeast Asia. In seven of the calls, for example, little more was said than "I'll call you back" or "call me back later." (GX26A; GX27A; GX44A; GX45A; GX49A; GX51A; GX58A). Three other calls between Hartung and Sandy Alexander referred to "lobbyists," "senators" and "papers." Because Bonner was not a party to these calls, the jury reasonably could have concluded that those three calls related to Hartung's efforts to provide Alexander with information

about POWs, despite Bonner's testimony that he believed Hartung and Alexander were speaking in code about aspects of a contemplated drug deal. Tr. at 638–39.

As for those limited number of calls which Alexander's counsel conceded "had something to do with drugs,"[3] I do not agree that they compel forfeiture as a matter of law. Accepting that those calls to the Building were somehow related to the cocaine deals, I do not believe that, as a matter of law, they necessarily *facilitated* Alexander's cocaine sales. Those calls were one step removed from the actual sales or even arranging of the sales, since, at best, they simply set up meetings at which the sales were arranged or occurred. No specifics, such as amount or price were discussed explicitly, or in code. Hence, the arranging as well as the consummation of the cocaine sales required the privacy or inconspicuousness of some other setting; the privacy afforded by Sandy Alexander's telephone, thus, was not integral to the arranging of the cocaine sales. In fact, by purposefully not discussing specifics about drug transactions, such as price or quantity, the parties to the calls expressly declined to make use of the privacy of the telephone in their illegal activities. Under these circumstances, it was a jury question whether the use of the telephone was incidental or fortuitous to the actual drug sales.

The Government contends that the phone calls were critical to the cocaine sales because it was only by calling Sandy Alexander at his residence that Bonner and Hartung could inform him that they wanted to arrange another deal. This argument ignores the fact that Bonner and Hartung could have travelled to meet Alexander outside the club as they had on other occasions. In any event, even if arranging a meeting had to be done by calling Alexander at home, the calls were still a substantial step removed from the actual arranging of the deals and the

---

**3.** GX43A(11/28/84): Bonner calls Alexander, and Colette Alexander picks up. She says "Listen, he's in the tub still, uh.... Listen. He said, uh, to tell you before that, uh, he needs about 24–hour's notice and, uh, (U/I) for you to come up, and spend a day. And he'll take you over to see the producers and all that stuff."); GX44A (11/30/84: Buitendorp call to Alexander setting

up meeting at the Daily Planet); GX52A (12/18/84: Buitendorp arranges to meet Alexander at "America," a New York City restaurant); GX 53A (12/18/84: Hartung arranges to meet Alexander for dinner on 12/19 at 7:30 p.m.); GX57A (1/24/85: Buitendorp tells Colette Alexander that he will be at house in ½ hour).

privacy of Alexander's telephone line was not necessary in arranging the actual sales. Emphasizing the privacy afforded by telephone lines generally, the Government ignores the fact that the parties did not employ this privacy in setting up the meetings where the cocaine sales were arranged or consummated since the last sale, by the Government's own evidence, was not arranged by telephone calls.

The cases cited by the Government do not suggest that a tangential link between phone calls and the actual arranging of illegal transactions suffices to compel forfeiture as a matter of law. For example, in the two telephone calls at issue in *United States v. One Parcel of Real Estate Commonly Known As 916 Douglas Avenue, Elgin Illinois*, 903 F.2d 490 (7th Cir.1990), *cert. denied*, 498 U.S. 1126, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991), the parties entered into a specific agreement to purchase cocaine, specifying the quantity and price of the drugs to be purchased during the calls. Since the claimant had "negotiated the price and quantity of cocaine to be sold" in the calls, the Seventh Circuit held that "the connection between the underlying drug transaction and [the claimant's] property was more than incidental and fortuitous." 903 F.2d at 494. Similarly, in *United States v. Lewis*, 987 F.2d 1349, 1356 (8th Cir.1993), the Eighth Circuit held that the record supported the jury's finding that more than an "incidental or fortuitous contact" between the claimant's cellular phone and his criminal activity existed since, on one occasion, the claimant telephoned his cocaine supplier on the cellular phone and obtained a price quote for five kilograms of cocaine.[4]

Because the telephone calls here were one step removed from the arranging of the drug transactions, and the privacy provided by Sandy Alexander's telephone line was not used to arrange the drug deals, I do not believe that the phone calls establish, as a matter law, that the Building was used to facilitate felony narcotics violations. Whether the calls constituted facilitation was, therefore, a jury question, which a reasonable jury could have resolved in favor of the claimants.

### c. The Evidence Rebutting the Government's Prima Facie Showing that the Building was Used in the Commercial Distribution of Narcotics during the Relevant Time Frame

As a final argument, the Government maintains that the claimants failed to rebut its *"prima facie* showing that individual HAMC members used their respective apartments in the Building during the relevant time period in connection with their commercial drug-dealing." Pl. Mem. at 31–32. This *prima facie* showing, according to the Government was made out through the Stipulation of Facts that 12 NYC Chapter HAMC members were convicted of drug conspiracy offenses; physical evidence seized from the Building during the May 2, 1985 raid; and the expert testimony of Louis Barbaria and Terry Katz purporting to explain the significance of that evidence.

However, Paul Casey's testimony, if credited, certainly provided a basis upon which the jury could conclude that the claimants had disproved, by a preponderance of the evi-

---

**4.** The nature of the telephone calls at issue in *United States v. 9239 South Central, Oak Lawn, Illinois*, 1991 WL 222180 (N.D.Ill.1991) is unclear. The government in that case contended that the parties arranged the drug transactions. The district court, however, only mentioned that in two of the conversations, the parties spoke of "do[ing] it," which the undercover agent testified referred to doing a cocaine deal. 1991 WL 222180 at *2. It is uncertain, then, whether more specific aspects of the deals were discussed in the telephone conversations at issue. In any event, the court's finding that the claimant's home facilitated the cocaine transactions was not based solely on the telephone conversations. The government had presented uncontradicted evidence that the agent had sold cocaine to the

claimant on approximately twenty-four occasions, often delivering the drugs to the claimant's home.

Although in *United States v. Zuniga*, 835 F.Supp. 622 (M.D.Fla.1993) the court found the claimant's home forfeitable as a matter of law based on ten phone calls placed to an undercover agent, nowhere does the opinion indicate the substance of these conversations. I assume that the actual drug transactions at issue were arranged on the phone, since the court found that "[t]he use of the telephone substantially connected the home to the offenses of which [claimant] was convicted," giving the home "more than an incidental or fortuitous connection to the offenses." 835 F.Supp. at 624.

dence, that HAMC members operated a methamphetamine distribution network from the Building. First, Casey, the admitted manufacturer or "cooker" of methamphetamine for the club, stated in no uncertain terms that the methamphetamine conspiracy had ended months prior to the enactment of the forfeiture laws. Tr. at 1511–13. Indeed, Casey's claim was substantiated by Barbaria's testimony that there was a methamphetamine "drought" during most of the relevant time period, Tr. at 504, and that the Weisbrod–Alexander–Casey enterprise had ended by October 1984.

Second, Casey testified about certain unwritten club rules that, if believed, would suggest that the Building was never used in any illegal drug distribution activities of NYC Chapter HAMC members. He stated that commercial quantities of narcotics were never allowed in the Building, (Tr. at 1567–68, 1606), although members were allowed to maintain "personal use" amounts there. Tr. at 1518. Casey also testified, and the Government's expert Barbaria confirmed, (Tr. at 337), that illegal activities were not to be discussed, and were never discussed, during NYC Chapter HAMC "church meetings." Tr. at 1727, 1730–31.

Third, Casey testified that the items found in his apartment were put to innocent uses, had not been used at all or were leftover from the defunct methamphetamine conspiracy. As for the counter-surveillance devices, Casey claimed that he used the scanner and frequency books, like many law-abiding citizens, as entertainment, and asserted that those devices did not reveal sensitive law enforcement information. (Tr. 1735) Casey further testified that he had never operated the hand held scanner, (Tr. at 1565–66), and that he had used the telephone wire testers as a portable phone. Tr. at 1737.

The small quantity of methamphetamine found in Casey's apartment, when coupled with Casey's testimony about the club rule against possession of commercial quantities of narcotics in the Building (albeit with the proviso that "personal use" quantities were permitted), certainly permitted the jury to reject the expert's testimony that the small quantity of high purity of narcotics seized in the Building bespoke commercial drug activity in the Building. The jury was free to infer that the small quantities of methamphetamine found were remnants from the earlier methamphetamine conspiracy or personal use amounts derived from larger high purity stashes kept elsewhere. This is especially true given the absence of large quantities of drug dilutants in the various apartments at the time of the raid and the admitted high tolerance for methamphetamine among many NYC Chapter HAMC members.

As for the other items found in the Building, the jury was also free to reject the expert's conclusions given the absence of any evidence as to where in the various apartments these items were found—a factor one of the Government's experts, Terry Katz, admitted was highly relevant in determining whether an item was related to on-going drug activity. Tr. at 1129–31 (Sergeant Katz admits that because a wide-variety of household items might be used in drug activity, the location of such items is "very important" in determining whether they are drug-related).

## II. *The Motion for a New Trial*

The same evidence that compels denial of the Government's motion for judgment as a matter of law also convinces me that a new trial is not warranted.

■ "A motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result' or ... the verdict is a miscarriage of justice." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992); *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988). A district court has substantial discretion to grant a motion for a new trial, and unlike the posture required in considering motions for judgment as a matter of law, the trial judge may weigh conflicting evidence without viewing it in the light most favorable to the verdict winner. *Song*, 957 F.2d at 1047; *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978).

■ I, however, decline to exercise my discretion to grant the Government's motion for a new trial because I do not believe that

the jury's verdict was seriously erroneous or a miscarriage of justice. While the Government's evidentiary presentation met the low threshold of establishing a "nexus" sufficient to demonstrate probable cause, I did not, and still do not, consider that the Government provided substantial evidence of a wide-ranging methamphetamine conspiracy *operated out of the Building during the relevant time period*,[5] particularly given the special care exercised by NYC Chapter HAMC members—confirmed by the Government's own witnesses—to shield the clubhouse from illegal activities. For the reasons discussed previously, I also do not find as a matter of law that the Government established that the Building facilitated Sandy Alexander's cocaine deals.

I do not doubt for a moment that individual HAMC members, including Sandy Alexander and Paul Casey, engaged in criminal activity, often violent and corrupt. However, it is the Building and not the general criminality of HAMC members that was on trial in this case—a point the Government sometimes lost track of. Without the testimony of William Medeiros, the Government's evidence linking the Building to felony narcotics violations was, in my estimation, rather scanty indeed. Casting the Building in the haze of the HAMC's general criminality and the unconventional lifestyle of its members might have been a potent, although improper, method of bolstering the fairly tenuous connection between the Building and drug activities during the relevant time frame. The jury, as its verdict demonstrates, did not succumb to the temptation of concluding that the individual members' admitted criminal activities engulfed every aspect of their lives, including their homes, but rather parsed through the evidence, giving it the weight they believed it merited. All in all, on this record, I can not and do not say that the jury's ultimate decision that the Building was not used to facilitate a felony narcotics violation was seriously erroneous, or even different from the conclusion I would have reached were I the trier of fact. Consequently, the Government's motion for a new trial is denied.

### CONCLUSION

For the reasons set forth above, the Government's motion for judgment as a matter of law, or alternatively, for a new trial is DENIED.

**SO ORDERED.**

---

5. The Government demonstrated that Alexander had sufficient time and notice before the raid to discard narcotics or other incriminating evidence. This factor does not establish, however, that drugs actually existed in the Building prior to the raid.