983 F.2d 396
 UNITED STATES of America, Plaintiff-Appellee-Cross-Appellant,
v.
ALL RIGHT, TITLE AND INTEREST IN REAL PROPERTY AND
APPURTENANCES THERETO KNOWN AS 785 ST. NICHOLAS AVE. AND 789
ST. NICHOLAS AVE. and a Leasehold Interest Therein Known as
the Franchise Restaurant and 1208 Clay Ave. Bronx, New York;
All Bank Accounts in the Names of or Controlled in Whole or
in Part by Norma and/or Lloyd Beckford at Dollar Dry Dock
Bank, 101 E. 170th St. Bronx, NY, Including Account Numbers
34010316949-0, 340103316947-0, 340103314974 & 34180001716-2
and Bank of Nova Scotia, 1 Liberty Plaza, New York, NY
Including Account Number 1483, Defendants-In-Rem-Appellants,
and
Norma Beckford and Lloyd Beckford,
Claimants-Appellants-Cross-Appellees.
 Nos. 162, 270, Dockets 92-6077, 92-6079.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 1, 1992.
Decided Jan. 6, 1993.
 
 Murray Appleman, New York City, for claimants-appellants-cross-appellees and defendants-in-rem-appellants.
 Bart G. Van DeWeghe, Asst. U.S. Atty., S.D.N.Y., New York City (Ping C. Moy, Asst. U.S. Atty., and Otto G. Obermaier, U.S. Atty., S.D.N.Y., of counsel), for plaintiff-appellee-cross-appellant.
 Before: MESKILL, Chief Judge, OAKES and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal involves real property and bank accounts in New York City that the United States seeks to have forfeited to it because the property allegedly was used to facilitate drug-trafficking or represented the proceeds of such trafficking. In an Ode written 2000 years ago the poet Horace enjoined the Romans to: "Carpe diem"--"Seize today, and trust as little As thou mayst tomorrow's light." The Complete Works of Horace 143 (Casper J. Kraemer, Jr. ed., Modern Library 1936). But the poet's admonition to "use today, forget tomorrow" was not an invitation to lawlessness. From the record before us it appears rather that claimants in this in rem proceeding conducted their activities heedless of the consequences that might follow. In so doing they subjected their property to the government's awesome forfeiture power to seize it. It remains our task to ensure that the purported forfeiture accords claimants their rights under the law.
 
 
 2
 Claimants-appellants Norma and Lloyd Beckford, wife and husband, appeal from a judgment entered on January 22, 1992 in the United States District Court for the Southern District of New York (Stanton, J.) that forfeited their right, title, and interest in four New York City buildings upon a finding they had used their property to facilitate drug trafficking in violation of 21 U.S.C. § 881(a)(7) (1988). Two bank accounts in claimants' names at the Dollar Dry Dock Bank in the same city were found not to be subject to forfeiture under § 881(a)(6) because the district court ruled the government had failed to establish probable cause showing that the accounts contained proceeds traceable to drug transactions. The government cross-appeals from that portion of the judgment dismissing its forfeiture claim against the two bank accounts. We affirm the portion of the judgment and final order of forfeiture dealing with the real property and vacate the portion dealing with the two bank accounts and remand for further proceedings.
 
 BACKGROUND
 Real Property
 
 3
 The facts supporting the real property and bank accounts in the civil in rem proceeding need to be stated. The Beckfords owned three adjacent buildings at 785-87-89 St. Nicholas Avenue in Manhattan in which they leased apartments for residential purposes and ground-floor store fronts for commercial purposes. Appellants also owned and operated the Franchise Restaurant on the ground floor at 789 St. Nicholas Avenue and an apartment building at 1208 Clay Avenue in the Bronx. They and their son lived in separate apartments in the Clay Avenue building, the remaining units being let to other residential tenants.
 
 
 4
 Evidence introduced before the district court demonstrated an astonishing number of drug transactions occurring in, near, and related to these properties. Many directly involved the claimants. Between 1987 and 1990 the New York City Police Department made 66 narcotics-related arrests inside or in front of 789 St. Nicholas Avenue and found drugs on the property on numerous occasions. Twenty-nine of these arrests resulted in convictions. Some of the arrests occurred after marijuana had been purchased by individuals who were in the Franchise Restaurant, often in close proximity to one of the claimants.
 
 
 5
 Several of the drug-related arrests involved the claimants, their children, or their employees. For example, on August 22, 1987 Norma Beckford was arrested inside the Franchise Restaurant for possession of marijuana; on March 21, 1988 she and her husband were arrested following a sale of marijuana by an employee in the same restaurant to an undercover officer. Searches of the premises subsequent to those arrests revealed a .357 magnum revolver, large amounts of cash, and a quantity of marijuana. The Beckford's son and daughter were convicted on more than one occasion in 1989 for the criminal sale and possession of marijuana as a result of their activity near 789 St. Nicholas Avenue. As could be anticipated with this amount of lawlessness occurring on the property, violence followed. One drug-related homicide took place at the restaurant in Lloyd Beckford's presence. Another murder victim, one Victor Mora, was found by a police officer a block away from the Franchise Restaurant; before he died, Mora identified the restaurant as the place where he had been shot.
 
 
 6
 In addition, large numbers of arrests were made inside and in front of 785 and 787 St. Nicholas Avenue. In the two-year period between 1988 and 1990 31 drug-related arrests were made at 785 St. Nicholas Avenue and eight similar arrests were made at 787 St. Nicholas. Further, searches executed pursuant to a search warrant at the claimants' and their son's apartments at 1208 Clay Avenue building on December 7, 1990 revealed weapons, drugs, drug paraphernalia, and large amounts of cash.
 
 
 7
 Based on this and other, more detailed evidence, the district court found the government had established the requisite probable cause to believe the subject real properties were being used to facilitate drug trafficking and were therefore subject to forfeiture pursuant to § 881(a)(7). Despite abundant evidence of drug trafficking, including their own drug-related arrests on the property, the Beckfords insisted they had no direct knowledge that their properties were being used as marijuana distribution locations. They further asserted that they had taken all reasonable precautions to prevent others from trafficking in drugs on their property, for instance, by erecting gates at certain entrances. Upon weighing the proof submitted, the trial court ruled that forfeiture of the properties was warranted.
 
 Bank Accounts
 
 8
 The government also sought to have forfeited two Dollar Dry Dock Bank accounts because it believes the balances in each of them represent drug-trafficking proceeds. The accounts contain about $79,000. Although claimants possessed bank books reflecting ownership of several accounts at that bank, only account numbers 34-01-0316949-9 and 34-01-0316947-3 remain open. These two accounts constitute the res that is the subject of the government's cross-appeal. Prosecutors obtained information about those accounts primarily from bank books seized at 1208 Clay Avenue during the December 7, 1990 search. Bank records for three predecessor accounts had been seized during the search following Norma Beckford's August 22, 1987 arrest at the restaurant.
 
 
 9
 The government had originally sought forfeiture of another account at the Bank of Nova Scotia in New York, but later dropped this action. The government additionally calls attention to a separate, very sizable account in the claimants' names at a Jamaican bank, which Norma Beckford testified contained proceeds from a farm and fishing business her family operates in that country. Since the government has not instituted forfeiture proceedings against this account and provided no evidence linking it to the funds in the Dollar Dry Dock account, it is extraneous evidence, irrelevant to the present proceedings. Hence, we do not consider the Jamaican account.
 
 
 10
 The government built its civil in rem case against the two Dollar Dry Dock accounts based on substantial deposits made into them and their predecessors. Between June 11, 1985 and July 31, 1987 claimants deposited $56,000 into an account numbered 34-01-0304268-8, which had a $46,599 balance on July 31, 1987 but became inactive following the seizure of its bank book during Norma Beckford's August 1987 arrest. Claimants then made an initial deposit into account number 34-01-0316949-9--one of the subject accounts before us--on December 8, 1987 in the amount of $46,779.36. This deposit appears to represent the closing balance of account 34-01-0304268-8. Between December 8, 1987 and December 6, 1990 $26,000 of deposits and withdrawals were made, leaving the subject account with an ending balance of $47,836.19.
 
 
 11
 The second account involves a similar scenario. From January 15, 1987 to June 19, 1987 claimants deposited $30,000 into an account numbered 34-01-0289271-1, which had a $30,226 balance on June 19, 1987. Activity ceased in that account too after police seized the bank book following Norma Beckford's arrest. The second subject account--34-01-0316947-3--was opened on December 8, 1987 with an initial deposit of $30,571.53 that appears to be the successor to account 34-01-0289271-1. Following deposits and withdrawals totaling about $19,000, on December 6, 1990 account 34-01-0316947-3 contained a final balance of $31,045.94. Records from a third bank book police also seized in connection with Norma Beckford's arrest revealed that claimants had deposited over $19,000 into an account numbered 34-01-0314000-3 between February 1986 and August 1987. What became of those funds remains unexplained.
 
 
 12
 Besides introducing the various seized bank books into evidence, the government also offered a number of claimants' tax returns in an effort to show a low level of legitimate income in relation to the high deposits made into the above accounts. Although claimants' 1985 returns showed a taxable income of only $2,021--a fact the government strongly emphasizes--the 1985 returns also reflected $25,692 in gross receipts from the restaurant, for a net profit of $13,257, and a total of $28,214 in rental income. The latter income was offset by deductions attributed to losses in the operation of the rental properties. In 1986 the Beckfords reported a taxable income of $17,229 resulting from gross receipts of $28,527, with a net profit of $14,226 from the restaurant, and total rental income of $41,904, again offset by substantial deductions. The Franchise Restaurant netted claimants $101,522 in gross receipts in 1987 and $51,547 in profit, and their joint return showed a taxable income of $69,657. The government stressed that growth in the restaurant's income corresponded with the August 22, 1987 seizure of 798 bags of marijuana in its kitchen.
 
 
 13
 In response--and to emphasize the legitimacy of their income--claimants introduced their 1988 tax return demonstrating gross receipts of $160,545 from the Franchise Restaurant and a taxable income of $75,643, and also produced their 1989 tax returns reflecting gross receipts of $55,481 from the restaurant and a taxable income of $45,139. When questioned at trial, the Beckfords stated that the bank accounts contained proceeds from their legitimate business and rental properties and that their tax returns revealed all their income. Although the government contended that the income reported from the Franchise Restaurant might have constituted drug sale proceeds rather than restaurant income, little evidence was introduced to support this theory.
 
 
 14
 Based on this proof, the district court found the government had not sufficiently established that the money in the bank accounts could be traced to drug trafficking and dismissed the government's forfeiture claims under § 881(a)(6). On cross-appeal, the government challenges the district court's failure to find probable cause with respect to these accounts. It also asserts the trial court made a ruling during the early course of the trial finding probable cause, which shifted the burden to the claimants to demonstrate the legitimacy of the money in the Dollar Dry Dock accounts, and generated an issue that the trial court failed to consider or rule upon.
 
 DISCUSSION
 I Forfeiture
 A. Origins
 
 15
 Before discussing the forfeiture of the real property and bank accounts in this case, we examine briefly the origins of the concept of forfeiting property to the sovereign. Liability of a "thing," an inanimate object or an animal that did a wrongful act, springs from ancient law. "When an ox gores a man or woman to death, the ox must be stoned, and its flesh shall not be eaten. The owner of the ox, however, shall go unpunished." Exodus 21:28.
 
 
 16
 Roman law followed this principle, except that where an animal caused damage its owner was subject to compensate the injured person or noxally to surrender the animal to the injured party. "Noxa" was used in the civil law to designate the offense and punishment for such damages by a slave or an animal. The civil law did not apply this rule to inanimate objects as did the common law, which held that when the object that did the act--a gun, for example--was tainted and must be surrendered. See Barry Nicholas, An Introduction to Roman Law 224 (1962). Justice Holmes in his classic book on the general theory of law, The Common Law, posits that vengeance on the immediate offender (the inanimate thing) was the object of early Greek and Roman law, not indemnity from the owner. Oliver W. Holmes, Jr., The Common Law 34 (1938).
 
 
 17
 In examining the English common law prior to the Revolution, we find the object that does the injury is called a "deodand," which Blackstone defines as the accursed thing. He explains that this notion had its roots in religion, as expiation for sudden death, so that, for instance, if a cart runs over a person, the cart is forfeited as a deodand. If one man kills another with a sword, the sword is forfeited as an accursed thing. As a result, in Blackstone's time, in all indictments for homicide the instrument that caused death and its value are found by the grand jury so that the king may claim the deodand. Added to this religious origin as a reason for forfeiture to the sovereign of the deodand is the view that the misfortune brought about by the object was due in part to the negligence of the owner and that a forfeiture of his property properly punishes him. 1 William Blackstone, Commentaries *290-91 The true reason for permitting forfeiture, according to Blackstone, was that it is part of the price a citizen must pay for breaking the social contract by violating the law. Id. at *289.
 
 
 18
 As a consequence, it appears to have been the law from the very earliest times that an inanimate object that is the instrumentality by which the law is violated is forfeited as an act of vengeance against the object. Its owner suffers the loss of the property on a negligence theory or as part of the price an owner must pay for permitting personal or real property to be an occasion for violating the law. Such is now the rule in American jurisprudence. See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 682-83, 94 S.Ct. 2080, 2091-92, 40 L.Ed.2d 452 (1974).
 
 B. Statutory Civil Forfeiture
 
 19
 With this historical background, we turn to the statutory law that governs forfeiture today. The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801-896 (1988), provides for civil forfeitures in Part E--"Administrative and Enforcement Provisions," §§ 871-886. The drug-related asset forfeiture scheme embodied in § 881 establishes a two-step process for the forfeiture of property to the sovereign United States. Under § 881(a)(7) that process applies to forfeiture of:
 
 
 20
 [a]ll real property ... which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited ... by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 21
 Forfeiture may be had under § 881(a)(6) of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance [as well as] all proceeds traceable to such an exchange." (emphasis added).
 
 
 22
 The government has three options when it institutes a civil forfeiture in rem proceeding: (1) file a complaint pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims, which triggers the issuance of a summons and warrant by a court clerk without requiring a certification of exigent circumstances; (2) request the issuance of a seizure warrant in the manner provided for in Fed.R.Crim.P. 41 that requires a finding of probable cause ex parte by a judicial officer; or (3) "when the Attorney General has probable cause to believe the property is subject to civil forfeiture," seize it following applicable customs law as set forth in § 881(d). See United States v. 4492 S. Livonia Road, 889 F.2d 1258, 1262-67 (2d Cir.1989).
 
 
 23
 The third option was followed in the case at hand. Under § 881(d) those procedures used under the United States Customs Laws, as spelled out at 19 U.S.C. § 1615 (1988), are incorporated in the forfeiture proceedings. Section 1615 describes the burden of proof and requires that the agency seeking forfeiture must first demonstrate probable cause supporting the action. The initial step in the forfeiture process under §§ 881(a)(6) and (7) accordingly requires the government establish probable cause that connects the property with drug trafficking. There need not be a substantial connection between the drug activities and the property in question, but only a nexus between them. See United States v. 38 Whalers Cove Drive, 954 F.2d 29, 33 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992); United States v. Whites Hill Road, 916 F.2d 808, 811-12 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991); United States v. Banco Cafetero Panama, 797 F.2d 1154, 1160 (2d Cir.1986). When forfeiture is of a bank account, the government must persuade the factfinder that there is probable cause to believe the funds represent proceeds traceable to a drug transaction. E.g., United States v. One 1987 Mercedes 560 SEL, 919 F.2d 327, 331-32 (5th Cir.1990).
 
 
 24
 To establish probable cause neither the real property nor bank proceeds need to be linked to any one particular transaction, Banco Cafetero, 797 F.2d at 1160, but the government must establish "reasonable grounds"--that is to say, rising above "mere suspicion"--that the property is subject to forfeiture. Id.; 4492 S. Livonia Road, 889 F.2d at 1267. The failure to account for large amounts of cash may be considered a factor in establishing probable cause that money represents the proceeds of drug transactions. See Whites Hill Road, 916 F.2d at 813; United States v. $2,500 in U.S. Currency, 689 F.2d 10, 16 (2d Cir.1982), cert. denied, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984).
 
 
 25
 Once the government has demonstrated probable cause, the second step in the forfeiture proceeding shifts the burden of proof to the claimant to demonstrate by a preponderance of the evidence that the factual predicates necessary to show probable cause have not been met or to show claimants lack of knowledge or consent to the drug-related activities. See 19 U.S.C. § 1615; Whites Hill Road, 916 F.2d at 812; United States v. 15 Black Ledge Drive, 897 F.2d 97, 102 (2d Cir.1990); 4492 S. Livonia Road, 889 F.2d at 1267. In the case of a bank account, the claimant bears the burden of proving that the account does not contain proceeds traceable to drug transactions, but rather represents legitimate income. See Banco Cafetero, 797 F.2d at 1161. Once probable cause has been shown, the ultimate burden of proof on whether factual predicates have been met or whether there is a lack of knowledge or consent is shouldered by the claimant. We turn now to apply this analysis to the district court's decision respecting the Beckford's real property and their Dollar Dry Dock accounts.
 
 II Two-Step Process Applied to Instant Case
 A. Real Property
 
 26
 We need not tarry long in explaining that the district court properly forfeited to the United States the real properties at 785-87-89 St. Nicholas Avenue and 1208 Clay Avenue. Due to the extraordinary volume of drug transactions occurring on, nearby, or directly related to the premises, the trial court correctly found probable cause existed to demonstrate that the properties had been used to facilitate drug trafficking. Further, it did not err in discrediting claimants' improbable testimony that they had no knowledge of drug-trafficking on their properties and had not consented to it, particularly given their own arrests on the site and their presence during arrests for various drug transactions that took place inside the Franchise Restaurant.
 
 
 27
 Claimants essentially contend that there was insufficient evidence to support the probable cause finding and that any drug trafficking on their premises was beyond their power to control because law-enforcement agencies had abandoned the drug-ridden neighborhood where their property was located, thereby giving drug-traffickers free reign there. We are unable to accept either argument. First, less evidence than was produced in the instant case has sufficed to establish the probable cause required for forfeiture of property. See, e.g., 15 Black Ledge Drive, 897 F.2d at 101; 38 Whalers Cove Drive, 954 F.2d at 32-34 (two cocaine sales totalling $250 sufficient to demonstrate probable cause for forfeiture of $68,000 interest in condominium); United States v. One 1986 Mercedes Benz, 846 F.2d 2, 5 (2d Cir.1988) (noting that transportation of minute quantity of drugs may suffice to merit forfeiture of vehicle).
 
 
 28
 Second, regardless of the drug-ridden culture that flourished in their neighborhood, claimants have failed to prove by a preponderance of the evidence that they took all the precautions reasonably within their power to prevent drug sales from occurring on their property. Once a claimant acquires knowledge that his or her property is being used for drug-related purposes, that individual must take reasonable steps to prevent this illicit use of the premises in order to show a lack of consent to such use. See United States v. 141st Street Corp., 911 F.2d 870, 879 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991); United States v. 418 57th St., 922 F.2d 129, 132 (2d Cir.1990). Claimants here made no such showing.
 
 
 29
 Moreover, claimants were not ignorant of the drug sales on their property. Nothing in the record suggests their involvement in or presence near drug sales had diminished or that they took reasonable steps to prevent others from using their property to peddle narcotics. That similar activity may well have pervaded the neighborhood does not excuse them. The legal standard we employ implicitly takes account of the hurdles property owners may face in drug-infested neighborhoods by requiring only that property owners take reasonable steps under the circumstances to prevent their property from facilitating drug transactions. See id. Thus, the district court properly forfeited claimants' real property to the United States.
 
 B. Bank Accounts
 
 30
 The trial court's decision with respect to the bank accounts is more problematic. The record is not clear as to which of the two stages of a forfeiture proceeding it had reached. As the trial began on December 17, 1991 the trial judge announced, "Based on the facts stipulated [ ] and on the materials submitted with the plaintiff's motion for summary judgment, I have determined that the probable cause requirement has been met by the government.... That shifts the burden to [claimants]...." As a result of this ruling, claimants proceeded to present their case. Although the district court stated its finding "considered only those activities taking place within the building," it had not limited its probable cause finding to claimants' real property and, more particularly, did not state that its probable cause finding excluded the bank accounts. The government's attorney declared at oral argument on appeal that he would have presented further proof that would have established probable cause with respect to the bank accounts had he not believed that a finding of probable cause had already been made at the commencement of the trial.
 
 
 31
 When the two-day trial ended on December 18, the trial court stated, "I find that the government has not established by any sufficient showing the fact or the inference that the money in the bank accounts was traceable to the exchanges of controlled substances in violation of the relevant chapter, and forfeiture of those sums will not be ordered." It is at least debatable whether this finding was contrary to the finding it made the day before. Again, the trial court failed to state whether the first or probable cause step was not established by the government's proof or whether the trial court was persuaded that claimant had carried its burden of proof at the second step of the proceeding.
 
 
 32
 The government urges us to make a probable cause finding based on a comparison between the income reported on claimants' 1985-86 tax returns and their bank deposits in the context of the extensive drug-trafficking that occurred on claimants' property. We decline that invitation and believe instead that this part of the case must be remanded. A factual determination of this sort is more properly decided by the district court in the first instance. Once the government has had the opportunity to present its proof more fully--and assuming it succeeds in demonstrating probable cause--the claimants must of course then be permitted to present evidence to prove that the source of the funds in the two subject bank accounts came from independent, non-drug-related sources. See One 1987 Mercedes 560 SEL, 919 F.2d at 331.
 
 
 33
 We emphasize that on remand circumstantial evidence may form the basis of a probable cause finding in forfeiture proceedings and that the funds need not be linked to specific drug transactions in order for the government to meet the probable cause standard. See Banco Cafetero, 797 F.2d at 1160. Particularly in cases involving bank accounts, money or other fungible assets, the only proof demonstrating probable cause is likely to be circumstantial, revealing unexplained wealth in conjunction with evidence of drug trafficking. See, e.g., Whites Hill Road, 916 F.2d at 813 (probable cause established where claimant convicted of selling heroin possessed large sums of unaccounted-for cash and purchased properties in cash); $2,500 in U.S. Currency, 689 F.2d at 16 (probable cause to forfeit cash established where no apparent explanation existed for large amount of cash on hand by claimant convicted on drug charges); cf. One 1987 Mercedes 560 SEL, 919 F.2d at 332 (claimant failed to meet burden of showing legitimacy where no explanation was given for purchase of $75,000 worth of assets during eight-month period other than his testimony that proceeds represented fruits of legitimate construction work and where claimant introduced no work orders, accounts ledgers or checks deposited supporting his claim).
 
 
 34
 Most important, while probable cause determinations under § 881 are made by the trial court's exercise of its judgment in light of all the circumstances, see One 1987 Mercedes 560 SEL, 919 F.2d at 331, it nonetheless remains the law that the connection between an individual's private assets and drug transactions is not one to be lightly made; the connection must be supported by proof amounting to more than "mere suspicion." See Banco Cafetero, 797 F.2d at 1160.
 
 CONCLUSION
 
 35
 Due to the seemingly inconsistent probable cause findings in the present record, remand is appropriate. There is a good likelihood additional evidence with respect to claimants' bank accounts will enhance whatever findings the district court eventually makes.
 
 
 36
 Accordingly, insofar as the judgment of the district court directed a forfeiture to the United States of claimants' real property, it is affirmed. Insofar as the district court's judgment found a lack of probable cause with respect to claimants' bank accounts, it is reversed and remanded for further proceedings consistent with this opinion.