UNITED STATES of America, Appellee,

v.

Angelo VOZZELLA; Anthony
Pietrosanti, Defendants,

Charles A. Urrego, a/k/a Jonathan
Rives, a/k/a Charlie Arms,
Defendant–Appellant.

No. 926, Docket 95–1502.

United States Court of Appeals,
Second Circuit.

Argued Feb. 7, 1997.

Decided Aug. 29, 1997.

**390**

Gerald J. Dichiara, New York City (Gino J. Singer, New York City, of counsel), for Defendant–Appellant.

Daniel Stark, Special Assistant United States Attorney, Eastern District of New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Emily Berger, Assistant United States Attorney, of counsel), Brooklyn, NY, for Appellee.

Before: WINTER, Chief Judge, OAKES, Circuit Judge, and SAND,\* District Judge.

WINTER, Chief Judge:

Charles Urrego appeals from his conviction by a jury before Judge Spatt for: (i) conspiring to extend extortionate loans in violation of 18 U.S.C. § 892; (ii) conspiring to collect extortionate loans in violation of 18 U.S.C. § 894; (iii) filing false bank loan applications in violation of 18 U.S.C. § 1014; and (iv) filing false tax returns in violation of 26 U.S.C. § 7206(1). We vacate Urrego's convictions on the two loan-sharking conspiracy counts because they were obtained by the use of evidence that was in part false and otherwise so misleading as to amount to falsity. *See Napue v. Illinois,* 360 U.S. 264, 270, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). However, this evidence did not affect Urrego's convictions on the false-bank-loan-application and false-tax-return counts, and Urrego does not claim error regarding them. We therefore affirm those convictions and remand either for a retrial on the conspiracy counts, if the government so elects, or for resentencing.

## BACKGROUND

Briefly stated, the government presented evidence at trial that, beginning in 1988, Urrego lent money at annual interest rates ranging from 23 percent to 253 percent. Urrego facilitated collection from borrowers by the threat of physical injury. At the time of his arrest in March 1992, Urrego had $500,000 "out on the street" in loans. Urrego failed to report on his tax returns any of the income from the loan-sharking activity and also submitted bank-loan applications containing false information.

---

\* The Honorable Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation.

■ Because Urrego was not charged with substantive crimes of extending and collecting particular extortionate loans but only with conspiring to do so, the government had to prove the existence of at least one co-conspirator on each count. *See generally United States v. Hendrickson,* 26 F.3d 321, 333 (2d Cir.1994) ("it is axiomatic that no conspiratorial agreement exists unless at least two culpable co-conspirators agree"). To that end, the government sought to prove that several of the people to whom Urrego lent money were acting as his agents—and therefore as co-conspirators—by making secondary loans. One of Urrego's primary defenses against the loan-sharking charges was that although the purported agents told him that they were relending the money, they were in fact making personal use of the money rather than lending it. Although Urrego's claims would not be a defense to a substantive loan-sharking charge, they would, if accepted by the jury, negate the existence of any agreement between Urrego and an alleged co-conspirator.[1]

Urrego was successful in proving at trial that several of the people who told him they were re-lending money actually used the money themselves. For example, Herb Goodman had told Urrego that he had re-lent nearly $100,000 borrowed from Urrego. In fact, Goodman was gambling away the money. William Conklin admitted at trial that at least some of the money borrowed from Urrego was put to personal use rather than re-lent. Conklin testified that he kept a list of names and phone numbers of borrowers to show Urrego but that some of the names were fictitious.

Important to the government's case were records seized from Anthony Pietrosanti, one of Urrego's purported agents/co-conspirators. These contained lists of names, loans, and interest rates, and matched records found in Urrego's apartment. The government emphasized the Pietrosanti records in its opening statement and summation as well.[2] It also called an FBI agent, Raymond Stirling, to testify that Pietrosanti's records reflected loan-sharking and that the identical records obtained from Pietrosanti and Urrego were "part of one and the same business." Pietrosanti was not called as a witness at trial, and Urrego was unable to undermine the veracity of Pietrosanti's purported records of loan-sharking.

However, approximately one year before the trial, Pietrosanti stated during a proffer session with prosecutors that he never made any loans to third parties, that the records seized from him were entirely fictitious, and that the money he borrowed from Urrego was strictly for his personal use as a compulsive gambler. The government checked two names and phone numbers on the list and found that both entries were false. Moreover, most of the phone numbers on the records were for a phone in Pietrosanti's bar. The government made no further inquiry into the veracity of the records and later dropped the charges against Pietrosanti.

Pietrosanti's statement to the government about the fictitiousness of the records did not come to Urrego's attention until after his trial, when it appeared in his Presentence Investigation Report. Arguing that the government had not met its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding exculpatory information regarding the Pietrosanti records, as well as by relying upon them as evidence, Urrego moved for a new trial pursuant to Fed.R.Crim.P. 33.

## DISCUSSION

### A. The Brady Issue

■ *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342

---

1. At oral argument, the government argued that Urrego would be guilty of the charged conspiracy if he merely *thought* that his borrowers were acting as his agents, whether or not they made any secondary loans or intended to do so. This theory is contrary to settled law in this Circuit. "[T]o establish a conspiratorial agreement, the Government must demonstrate that the conspirators possessed at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Hendrickson,* 26 F.3d 321,

333 (2d Cir.1994) (internal quotation and citation omitted). This principle is also the foundation for the rule that a defendant cannot be convicted of conspiracy if the conspiracy consists solely of the defendant and government agents. *Id.; United States v. Hurtado,* 47 F.3d 577, 586 (2d Cir.1995).

2. The government was represented by different counsel at trial.

(1976), describes "three quite different situations" in which the rule of *Brady v. Maryland* applies and sets forth varying tests of materiality to determine whether a criminal conviction must be overturned.

■ "In the first situation, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id.* (citation omitted). The fundamental unfairness of a conviction obtained through the use of false evidence has long been recognized by the Supreme Court. *See, e.g., Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). As *Agurs* noted, this conduct not only violates constitutionally mandated disclosure obligations, but "involve[s] prosecutorial misconduct" and a "corruption of the truth-seeking function of the trial process." 427 U.S. at 104, 96 S.Ct at 2397. The Supreme Court has therefore imposed "a strict standard of materiality" where the prosecution uses evidence that it knew or should have known was false. In such a case, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103, 96 S.Ct. at 2397.

■ The second situation in which *Brady* applies is illustrated by *Brady* itself and "is characterized by a pretrial request for specific evidence," *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397 followed by noncompliance. A strict standard of materiality also applies in this situation, "with the defendant being entitled to a new trial if there is any reasonable likelihood that the evidence could have affected the outcome of the trial." *Ostrer v. United States,* 577 F.2d 782, 786 (2d Cir.1978) (citing *Agurs*).

■ The final situation is when the defense makes either no discovery request or only a general request for "Brady" material, and exculpatory material is withheld. In this third situation, the standard of materiality is more favorable to the government. The defendant will be "entitled to a new trial only if the undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt that otherwise would not exist." *Ostrer,* 577 F.2d at 786 (citing *Agurs*).

■ The government's conduct here falls within both the first and third *Brady* categories. It is within the first category because the Pietrosanti records were known to be partially false and were presented to the jury in a fashion so highly misleading as to amount to falsity regarding their veracity as a whole. The conduct is also within the third *Brady* category because, given the manner in which the records were presented to the jury, the statements made by Pietrosanti during the proffer session were highly exculpatory as to Urrego's participation in a conspiracy. Although the issue probably does not affect the outcome, we believe that where undisclosed *Brady* material undermines the credibility of specific evidence that the government otherwise knew or should have known to be false, the standard of materiality applicable to the first *Brady* category applies. In such circumstances, the failure to disclose is part and parcel of the presentation of false evidence to the jury and therefore "corrupt[s] ... the truth-seeking function of the trial process," *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397 and is a far more serious act than a failure to disclose generally exculpatory material.

In the instant matter, it is clear that the government knowingly presented false evidence: two names of "borrowers" in the Pietrosanti records were fictitious. Moreover, whatever ignorance the government had about the veracity of the rest of the records was willful. Having been told by the author of the records that they were bogus, having verified that unwelcome fact as to two names, and knowing that most of the phone numbers were for a phone in Pietrosanti's bar, the government simply ceased further inquiry.

In addition to introducing evidence that was at least partially false, the government solicited testimony about the records that was so misleading as to amount to falsity. Stirling testified that notations on the Pietrosanti records indicated principal, interest, and schedule of payments. After comparing

the Pietrosanti records to records seized from Urrego, Stirling stated that both sets of "records were a part of one and the same business." Given that the government should have had grave doubt as to whether the records reflected transactions of a "business" in which Urrego was involved—instead of a fraud on him—the government should not have presented testimony strongly contributing to the very misleading message sent to the jury.

*Agurs* stated that a defendant's constitutional rights are violated when the government uses evidence that it "knew, *or should have known*" was false, 427 U.S. at 103, 96 S.Ct. at 2397 (emphasis added). In the instant case, the government knew that some portion of the records was fictitious, that their author had stated that they were false in their entirety, and that no adequate further inquiry had been made into their veracity. It should have known that introduction of the records with Stirling's unqualified testimony concerning their significance conveyed a message so misleading as to amount to falsity. The government's conduct therefore ran afoul of *Napue*, which stated:

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

360 U.S. at 269, 79 S.Ct. 1173, 1176, 3 L.Ed.2d 1217 (internal citations omitted).

The standard of materiality that must be satisfied in order for a conviction based on false evidence to be reversed is easily met in this case. As noted, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397. In arguments before the district court, the prosecutor stated that the government did not disclose Pietrosanti's statement about the fictitiousness of the records "[b]ecause it was our belief, your Honor, that it was not Brady material. It was our belief if it was exculpatory to anybody, it was exculpatory to Anthony Pietro-

santi. It did nothing with respect to Charles Urrego." However, for reasons already discussed, evidence that would exculpate Pietrosanti from loan-sharking would automatically tend to exculpate Urrego on the conspiracy charges. We therefore reverse Urrego's convictions on those counts.

### B. Search of Urrego's Apartment

■ Urrego also argues that evidence obtained during a search of his home should have been suppressed because, although the FBI agents carrying out the search had a valid warrant, they conducted a "no-knock" search in violation of 18 U.S.C. § 3109. Because the government may elect to re-try Urrego on the loan-sharking counts, we address the challenge to the evidence obtained in the search of his home.

■ Section 3109, known as the "knock-and-announce" statute, states:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Evidence seized in violation of Section 3109 must be excluded at trial unless "the noncompliance was excused by exigent circumstances." *United States v. Spinelli*, 848 F.2d 26, 28 (2d Cir.1988).

The pertinent facts are as follows. FBI agents, fearing that Urrego might mistake them for organized-crime hit-men, informed him shortly before the search that they had a warrant and would be coming to search his home. Arriving at the apartment, the agents called out for Urrego and slipped their business card under the door. When he did not answer, they forcibly entered the premises. It is unclear exactly how much time elapsed between the announcing of the agents' presence and the forcible entry.

This evidentiary gap does not justify a conclusion that Section 3109 was violated. The hearing at which the pertinent record was made concerned Urrego's motion to suppress the evidence seized from his home on

the ground that the warrant affidavit contained material misrepresentations. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The precise length of time between the agents' announcing of their presence and the forcible entry was not relevant to the *Franks* issue. During the *Franks* hearing, testimony was given that the agents slipped the card under the door, called for Urrego to open immediately and advised him that if he did not, the agents would make their own entry. When "[Urrego] did not answer the door," forcible entry was made. Only after completion of testimony and in oral argument before the magistrate judge concerning a *Franks* violation, did Urrego's counsel raise the quite different no-knock issue.

 In this light, the record simply does not justify suppression on the ground that Section 3109 was violated, and we need not reach the issue of whether exigent circumstances existed. To be sure, the precise length of time between the arrival of the agents and the forcible entry would be illuminating, but the absence of such evidence on this record does not call for an inference that the interval was so short as to violate Section 3109. The evidentiary gap exists only because the record was made before the issue was raised. Caselaw does not suggest that Section 3109 requires extended periods before entry can be forced, *see United States v. DeLutis,* 722 F.2d 902, 908 (1st Cir.1983) (collecting cases that have held that 20 seconds is an adequate wait before officers may force entry), and the testimony that, after the agents called for Urrego and slipped their card under the door, he "did not answer" is on this record more than enough to support a denial of the motion.[3]

## CONCLUSION

Urrego's convictions on counts one and two of his indictment, for conspiracy to extend

and collect extortionate loans, must be vacated due to the government's use of false evidence. Should the government choose to retry Urrego on these charges, the evidence seized from Urrego's home during a search on March 9, 1992, is admissible. Finally, we remand to the district court for a retrial on the conspiracy counts, if the government so elects, or for resentencing.[4]

---

[3] During the evidentiary hearing, the magistrate judge sustained an objection to a question regarding the length of the interval between the agents' announcing their presence and their forcible entry on the ground that it was not relevant to the *Franks* issue. That ruling was correct. When the no-knock issue was raised later, Urrego made no request to reopen the hearing to pin down the length of the interval.

[4] Because the district court does not appear to have imposed distinct sentences for each of the counts, we cannot merely vacate the sentences imposed for the loan-sharking convictions. A remand is therefore necessary.