**Hilden MENDEZ, Petitioner–Appellee,**

v.

**Christopher ARTUZ, Superintendent, Green Haven Correctional Facility, Respondent–Appellant.**

**Docket No. 00–2548.**

United States Court of Appeals, Second Circuit.

Argued: April 5, 2001.

Decided: Aug. 01, 2002.

Kerry Elgarten, The Legal Aid Society, Criminal Appeals Bureau, New York, NY, for Appellee.

Elizabeth F. Bernhardt, Assistant District Attorney, Bronx, N.Y. (Robert T. Johnson, District Attorney Bronx County, Joseph N. Ferdenzi, Assistant District Attorney, on the brief), for Appellant.

Before KEARSE, CABRANES and KATZMANN, Circuit Judges.

PER CURIAM.

Respondent Christopher Artuz appeals from a judgment of the United States District Court for the Southern District of New York (Lawrence M. McKenna, *Judge*), granting a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to petitioner Hilden Mendez on the ground that his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated. Mendez had been convicted by a jury of, *inter alia*, the attempted murder of Johnny Rodriguez and the murder of a second individual. The District Court, in granting the writ of habeas corpus, found that New York State authorities had failed to disclose material evidence favorable to Mendez—that another individual had placed a contract on the life of Johnny Rodriguez prior to the shooting—and that this failure undermined confidence in the outcome of the trial.

We affirm the decision below substantially for the reasons stated in the thorough and convincing opinion of Magistrate Judge Andrew J. Peck, *see Mendez v. Artuz*, No. 98 Civ. 2652, 2000 WL 722613 (S.D.N.Y. June 6, 2000), adopted *in toto* by the District Court, *see Mendez v. Artuz*, No. 98 Civ. 2652, 2000 WL 1154320 (S.D.N.Y. Aug.14, 2000). We assume familiarity with the facts and the procedural history outlined by Magistrate Judge Peck and write only to emphasize a few pertinent aspects of the state court record.

## DISCUSSION

The standard for federal habeas review of a claim arising under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is fully set forth in the decision below. *See Mendez*, 2000 WL 722613, at *11–13. We recently restated that standard: "In the context of *Brady*, a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *In re United States v. Coppa*, 267 F.3d 132, 135 (2d Cir.2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)) (internal citation omitted); *see also Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir.2001) (stating that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial ... resulting in a verdict worthy of confidence.") (internal quotation marks and citations omitted). The undisclosed evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see also U.S. v. Vozzella*, 124 F.3d 389, 392 (2d Cir.1997).

The suppressed evidence in question in this case included information that another person, Oswaldo Rodriguez (no relation to Johnny Rodriguez), held by police authorities in Virginia, had admitted to placing a contract on Johnny Rodriguez's life prior

to the shooting because he believed that Johnny Rodriguez had stolen $100,000 from him. *Mendez,* 2000 WL 722613, at *9. We agree with the District Court that in the context of the entire record presented here, "[a]dvancing the idea that someone else wanted to kill Johnny Rodriguez ... for an entirely different motive than the one attributed to petitioner Hilden Mendez (also known as *Tony* Mendez) as advanced by the prosecution at trial would have given Mendez the opportunity to establish reasonable doubt in the jury's mind as to who shot Johnny Rodriguez." *Id.* at *13. The suppressed information would have allowed Mendez to challenge the state's motive theory as advanced by Johnny Rodriguez and Victor Abreu, who had been with Mendez at the time that Mendez was arrested, either through cross-examination or the presentation of contradictory testimony. This would have provided a significant boost to the defense because the prosecution's motive theory—that Mendez had a motive to shoot Johnny Rodriguez because Johnny Rodriguez had been present at an earlier encounter when a friend of Johnny Rodriguez's shot at Mendez—together with the weak and contradictory eyewitness testimony at the shooting was not compelling. The suppressed information would have allowed Mendez to develop the alternative theory that Oswaldo Rodriguez sought to have Johnny Rodriguez killed because he thought that Johnny Rodriguez had stolen $100,000 from him.

While the dissent correctly notes that "[m]any persons may have had motives to kill Johnny Rodriguez, but there was only one shooter," we disagree with its interpretation that the previously undisclosed evidence "did not suggest an alternative culprit but only an additional motive"— thus not tending to exculpate Mendez. The previously undisclosed evidence does suggest a possible "alternative culprit"— that the shooter was the contract killer commissioned by Oswaldo Rodriguez. That the shooter passed the group of men without incident or altercation and then turned and opened fire with a machine gun also could be consistent with the theory that this shooting was a hired "hit" and not a personal vendetta. The undisclosed evidence also goes to motive. Johnny Rodriguez's alleged theft of $100,000 from Oswaldo Rodriguez explains why Oswaldo Rodriguez credibly might have wanted Johnny Rodriguez killed. Inasmuch as this evidence supplies a possible alternative perpetrator *and* motive, we cannot conclude that its exclusion from Mendez's trial did not prevent the jury from weighing differently all of the facts before it.

██ In contrast, the state asserted a weak and unlikely theory that Mendez's motive to shoot Johnny Rodriguez arose out of an altercation that Mendez had with an unnamed friend of Johnny Rodriguez while Johnny Rodriguez was present. Johnny Rodriguez testified that he and the friend were in Johnny Rodriguez's car when the friend got into a dispute with Mendez, got out of the car, and shot at Mendez, hitting Mendez's car twice. (Trial Transcript at 95) ("Tr."). While the friend argued with and shot at Mendez, Johnny Rodriguez pulled "ahead" and "parked" (Tr. 95), and thus was not directly involved in the dispute. The prosecutor argued that Mendez wanted to kill Johnny Rodriguez "because of that shooting incident.... I submit to you that this is [the] motive for all of this." (Tr. 487) But it is not at all clear from Johnny Rodriguez's testimony that Mendez even saw him at the scene of the shooting or associated him with the shooter. We are thus left with a rather strained and speculative prosecution motive theory: that Tony would seek to murder Johnny Rodriguez—but apparently not the unnamed person who actually shot at him—in front of multiple witnesses

because Johnny Rodriguez was earlier with the shooter but then was "parked ahead" in his car while the shooter attacked Mendez. Suppressed information is exculpatory and thus "favorable" to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses. *See United States v. Zuno–Arce,* 44 F.3d 1420, 1426 (9th Cir.1995); *cf. Bowen v. Maynard,* 799 F.2d 593, 612 (10th Cir.1986). *A fortiori,* this must be particularly true when the prosecution's motive theory is weak or unconvincing.

The state argues that the suppressed information was not favorable to the defense because it did not suggest an alternative shooter but only an additional motive for the shooting. It is true that the suppressed information did not name any contract killers hired by Alfredo Matos on behalf of Oswaldo Rodriguez. However, Alfredo Matos did not indicate in the suppressed DEA report that he knew Mendez. *Mendez,* 2000 WL 722613, at *8. Furthermore, the state did not present evidence connecting Mendez and Oswaldo Rodriguez. *Id.* at *13. In fact, Francis Paulino, who witnessed the theft of Oswaldo Rodriguez's $100,000, Romulo DeLeon, to whom Oswaldo Rodriguez stated that he had placed a contract on Johnny Rodriguez, and Oswaldo Rodriguez himself, all stated that they did not know Mendez. *Id.* at *6–7, *10, *13 (citing testimony at § 440.10 hearing). In addition, included among the suppressed documents was a report that members of the "Machederos" gang had been hired to do the shooting, *see id.* However, there was no evidence that Mendez was a member of this gang. The

suppressed information suggesting that more than one individual was hired to kill Johnny Rodriguez could have been corroborated by Johnny Rodriguez's trial testimony that he thought he saw a second armed gunman during the shooting. (Tr. 160–61) Presenting testimony to this effect, or asking questions about this on cross-examination, would have allowed the defendant to create reasonable doubt that he was the shooter. We believe that he should have been given that opportunity.[1]

We do not agree with the state that suppressed information was not material. In particular, the respondent-appellant stresses Johnny Rodriguez's identification of Mendez as the shooter, stating that Johnny Rodriguez accused Mendez immediately at the scene of the shooting and also later at the hospital—supporting the jury's conclusion that Mendez was the shooter.

However, other trial evidence showed that the identification testimony of Johnny Rodriguez was contradictory. Johnny Rodriguez first testified that he had "seen him [Mendez] about in the area" before the shooting. (Tr. 90) When asked whether "[b]efore August 3, 1990, the night of the shooting, did you know him by any name," Johnny Rodriguez responded "No." (Tr. 91) The prosecutor asked whether he later learned the defendant's name, and Johnny Rodriguez said "Yes" without further elaboration. (Tr. 91)

Later, the prosecutor asked, "When did you find out that [Mendez's nickname or alias] was Tony? Before the night of the incident?" Johnny Rodriguez replied "I've

---

1. It may be that the existence of another person who had a motive to kill Johnny Rodriguez would not undermine a jury's determination that Mendez, too, had a motive. But as we understand *Brady,* the suppressed information need not wholly discredit the prosecution's theory of the case; it must only "put the

whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene,* 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In that circumstance, the jury would be allowed to choose between the two competing theories of the case.

heard of him [Mendez], his name as Tony before, from that day of the dispute." (Tr. 113–14) The prosecutor followed up asking "[f]rom the day of the dispute you learned his [Mendez's] name was Tony?" And Johnny Rodriguez answered "[r]ight." (Tr. 114) From the context of the preceding questions, it is clear that the "dispute" that Johnny Rodriguez was referring to was the incident two weeks prior to August 3 that allegedly had provided the defendant's motive for the crime. Johnny Rodriguez therefore directly contradicted his earlier testimony that he only learned that the shooter was known as Tony after the August 3 shooting.

Johnny Rodriguez then gave a further description of his alleged on-scene identification of the defendant on August 3. He testified that while lying on the ground (Tr. 114), a blue-uniformed police officer spoke to him (Tr. 125), and "asked me if I seen who did it. And I said yes. I said Tony did it." (Tr. 114) The prosecution offered no corroboration for this. Officer Aponte testified that he was at the scene of the shooting on August 3 and spoke to Johnny Rodriguez, but stated that Johnny Rodriguez did not identify or describe the shooter. (Tr. 366) No other police officer who had been at the scene of the shooting testified at trial. The testimony about the later identification by Johnny Rodriguez at the hospital also raises questions. Detective Vickery testified that he and his partner interviewed Johnny Rodriguez at the hospital after the August 3 shooting and that Johnny Rodriguez never mentioned the name Tony, but only gave a description of the shooter. (Tr. 376) Detective Martinez interviewed Johnny Rodriguez for the first time in the hospital on August 3. (Tr. 339) In his trial testimony, Detective Martinez responded "yes" to the following question of the prosecutor: "And after the [hospital] conversation with Johnny Rodriguez, did there come a time when you heard the name of the person who did the shooting?" (Tr. 339) However, it was never clarified whether the detective learned this from Johnny Rodriguez at the hospital or some time afterwards, and the formulation of the prosecutor's question seems to imply that Detective Rodriguez learned of the shooter's alleged name only after meeting with Johnny Rodriguez at the hospital. Thus, no witness corroborated Johnny Rodriguez's claim that he identified the shooter as Tony at the scene of the shooting; he himself had testified earlier that he only learned that the shooter was named Tony after the August 3 shooting, and no clear testimony was presented about when, if ever, Johnny Rodriguez identified the shooter as Tony during later interviews at the hospital.

The contradictory eyewitness testimony about the shooter's height and weight also gives us pause. Detective Vickery testified that at the hospital Johnny Rodriguez described the unnamed shooter as 5′4″ tall, weighing 130 pounds. (Tr. 375) At the hospital Nelson Suarez, an eyewitness and victim, described the shooter to Detective Martinez as 5′2″ to 5′8″, weighing 130 pounds. (Tr. 314–16, 329–30) By contrast, at Mendez's arrest and booking, Detective Martinez noted that he was 6′2″ and weighed 190 pounds. (Tr. 351–52) Mendez weighed nearly *fifty percent more* and was approximately between *six to twelve inches taller* than what the eyewitness testified. These discrepancies are significant and troubling. The shooting took place on the street in the middle of the night. The shooter was wearing a baseball cap. (Tr. 116, 315, 375) Thus, the shooter's face was likely at least partially obscured by shadows. It should also .be noted that two eyewitnesses to the shooting testified at trial that they saw the shooter and that it was not Mendez. (Tr. 260, 398) One of these witnesses, who was related by marriage to Johnny Rodriguez and had worked with him for years—suggesting

that he likely had no motive to testify falsely in a way that would discredit Johnny Rodriguez—also corroborated the contemporaneous height and weight descriptions of the shooter given by the other eyewitnesses. (Tr. 398) (estimating that the shooter was 5'3" and weighed approximately 132 pounds). Evidence pointing to another motive for the shooting and the lack of connection between Mendez and Oswaldo Rodriguez and Alfredo Matos would have allowed the defendant to further emphasize the serious inconsistencies and flaws in the state's identification of him. In these circumstances, the undisclosed evidence undermines our confidence in the outcome of the trial.

The defendant could also have used the suppressed information to challenge the thoroughness and adequacy of the police investigation. *See Kyles,* 514 U.S. at 446 n. 15, 115 S.Ct. 1555 (stating that "indications of conscientious police work will enhance probative force and slovenly work will diminish it"). Presented with detailed information about a contract murder plot and no indication that Mendez was involved or even associated with the participants, the police essentially did nothing:

> Detective Martinez testified at the § 440.10 hearing that his investigation into the information about Oswaldo consisted only of checking to see if Oswaldo, a drug dealer, reported to his local police precinct that someone stole $100,000 in cash he had stashed in his mother's house. Since that theft was not report-

ed, Detective Martinez determined that "[i]t didn't have anything to do with the homicide." Detective Martinez never contacted any of the witnesses who told the Virginia detectives about the hit. *Mendez,* 2000 WL 722613, at *19. This response was, to say the least, inadequate. Prosecutors often argue, and courts agree, that "a large quantity of cash" is one of the "indicia of a drug dealer." *E.g., United States v. Lovelace,* 123 F.3d 650, 652 (7th Cir.1997); *Wright v. United States,* 113 F.3d 133, 135 (8th Cir.1997); *United States v. 785 St. Nicholas Ave.,* 983 F.2d 396, 403 (2d Cir.), *cert. denied,* 508 U.S. 913, 113 S.Ct. 2349, 124 L.Ed.2d 258 (1993); *United States v. Morris,* 977 F.2d 617, 622 (D.C.Cir.1992). It is difficult to understand why Detective Martinez did not realize that someone holding $100,000 in cash may well be involved in drug trafficking or other illegal activity and therefore be reluctant to admit this to the police, much less to request police involvement in tracking down the missing funds. The absence of any credible investigation could have allowed Mendez to present a strong challenge to the thoroughness and reliability of the police work.

## CONCLUSION

The suppressed information, which strikes at the central weaknesses in the prosecution's physical identification of Mendez and proffered motive for the shooting, undermines our confidence in the jury verdict.[2] In light of the substantial

---

2. We pause to note that the prosecution did not correctly set forth the nature of the *Brady* inquiry in its briefs to this Court. *See, e.g.,* Gov't Brief at 4 (arguing that a federal habeas court hearing a *Brady* claim must "defer to the jury's factual and credibility determinations"); *id.* at 18 ("The law requires deference to a jury's credibility findings."); *id.* at 34 (criticizing the district court for "disregard[ing] the jury's credibility findings"); Gov't Reply Brief at 12 ("[I]n considering these issues, this Court should defer to the jury, who heard, saw and evaluated the victims, and believed their identifications."). If it is argued that the jury was not presented with a full picture of the facts because the state choose to ignore its disclosure obligations, the constitutional inquiry into the materiality of the suppressed information cannot be based on "deference" to a verdict reached without the benefit of that information. If that were the standard, no *Brady* claim could ever be deemed meritorious.

length of time Mendez already has been incarcerated, the District Court shall issue a writ of *habeas corpus* to Mendez on the sixtieth calendar day after the issuance of our mandate unless the District Attorney of Bronx County has, by that point, taken concrete and substantial steps expeditiously to retry him. We affirm the denial of the petitioner's *Wade* claim for the reasons stated by the magistrate judge.

Affirmed.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from the view that habeas corpus was properly granted overturning the state-court conviction of petitioner Hilden Mendez. The issue at trial was whether Mendez was the man who shot and killed Albert Hayles and shot and wounded Johnny Rodriguez. In my view, the undisclosed evidence went solely to the question of whether another person also wished to have Rodriguez killed. Given, *inter alia*, (a) eyewitness identifications of Mendez as the shooter, (b) a prior altercation involving Mendez and Rodriguez, and (c) the testimony of Mendez's friend that, two days after the shooting, Mendez said he had recently shot someone with whom he had had an altercation, I am not persuaded that a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), resulted from the prosecution's failure to disclose to Mendez that another person had hired someone— of unknown identity—to kill Rodriguez.

The evidence included the following. Shortly after 1 a.m. on August 3, 1990, Rodriguez, his cousin-in-law David Pacheco, and Nelson Suarez were talking on a sidewalk in the Bronx, New York, waiting for Gustavo Guerra, a mechanic who repaired cars on the street, to finish repairing Rodriguez's car. Also present was Hayles, who was waiting for his own car to be repaired. A man approached and said something innocuous; he then walked a few steps away, turned around, pulled a machine gun from his waist, and, looking at Rodriguez, began to shoot.

The men promptly ran for cover. Pacheco and Guerra escaped uninjured. Suarez was shot once in the leg and survived. Hayles was shot twice and died. Rodriguez was shot in the arms and legs a total of 18 times but survived.

When the police arrived at the scene, they asked Rodriguez whether he had seen the shooter. Rodriguez testified that he responded that he had seen the shooter and that the shooter, whom he had previously seen in the neighborhood, was "Tony." No one else at the scene told the police that the shooter was known to them or looked familiar.

On August 6, the police received information that the person or persons they were looking for in connection with the shooting were in a jeep at a certain location. The police went there and found Mendez and Viterbo Abreu in a jeep. They arrested Mendez on murder charges; he admitted to using the name "Tony." On the following day, Mendez was placed in a lineup. Suarez was the only witness who viewed the lineup; he identified Mendez as the August 3 shooter.

Both Rodriguez and Suarez also identified Mendez as the shooter at trial. Shortly after the shooting, Rodriguez and Suarez had described the shooter as shorter and slighter (5'2" to 5'9" tall, 130 to 160 pounds) than Mendez's actual size (6'2" tall, 190 pounds); and they stated at trial that Mendez had looked somewhat slimmer at the time of the shooting than he did at trial. But both witnesses expressed certainty that Mendez was the shooter. Suarez, for example, testified that although he recalled the shooter as being shorter and thinner, the face was the same, it was Mendez's face he recognized,

and he had no doubt that Mendez was the shooter.

Rodriguez testified that he recognized Mendez at the August 3 shooting from an incident that had occurred some two-to-four weeks earlier. In that earlier encounter, Rodriguez and a companion had been in Rodriguez's car when the companion got into a violent argument with Mendez. The companion left Rodriguez's car and fired shots at Mendez. It was on that day that Rodriguez learned that Mendez was called "Tony."

Abreu, who was with Mendez when the police found him on August 6 and was arrested on an unrelated weapons charge, also testified for the prosecution. Abreu had known Mendez for five years and had always known him by the name "Tony." Abreu testified that on August 5, Mendez was driving a Toyota Prelude automobile with two bullet holes in it, and that Mendez said he had been shot at and had retaliated by shooting two or three people he held responsible for shooting at him. These statements by Mendez provided corroboration both for Rodriguez's account of his prior encounter with Mendez and for Rodriguez's recognition of Mendez as the August 3 shooter.

The evidence that was not disclosed by the prosecution, and that has occasioned the granting of habeas overturning Mendez's conviction, was that one Oswaldo D. Rodriguez ("Oswaldo") (apparently not related to Johnny Rodriguez) had commissioned the killing of Johnny Rodriguez as revenge for a theft of money belonging to Oswaldo. In the context of the present case, I have difficulty seeing that this evidence was material, *i.e.*, that if it had been disclosed there was a reasonable probability that the outcome of the trial would have been different.

Many persons may have had motives to kill Johnny Rodriguez, but there was only one shooter. Johnny Rodriguez, at the scene of the shooting, identified Mendez by nickname; Suarez identified Mendez in a lineup four days after the shooting; and both Rodriguez and Suarez identified Mendez at trial. The fact that another person too had a motive and may have commissioned a killing does not affect the positive identification testimony.

To be sure, not all of those present at the shooting identified Mendez as the shooter. Guerra and Pacheco testified that the shooter was not Mendez; but there was ample basis for the jury to discredit that testimony as having been recently fabricated. Guerra, for example, testified at trial that he had gotten a good look at the shooter; but he admitted that he did not see the shooter at first because his head was under the hood of Rodriguez's car when the shooter approached, and that when the shooting started he ran. And although Guerra testified that he looked at the shooter from between cars, he had told a police officer that he was not present at the August 3 shooting and had seen nothing. Pacheco too testified at trial that he had gotten a good look at the shooter; and he testified that he recognized the shooter as someone he knew as "Ray." But Pacheco, when questioned by the police, had not said he recognized the shooter.

The evidence that Oswaldo had commissioned a killing did nothing to support the testimony of these two witnesses. There was no indication that the man whom Oswaldo had hired was named Ray; no name was provided for the hit man. Indeed, the Oswaldo evidence may have provided another indicium that the shooter was Mendez: Abreu testified that Mendez drove a Toyota, and the person who informed the police about Oswaldo stated that Oswaldo's hit man had driven a Toyota.

In sum, there was abundant evidence that Mendez was the shooter, and the un-

disclosed evidence did not suggest an alternative culprit but only an additional motive. The fact that another person had a motive to kill Rodriguez could not undermine the evidence that Mendez too had such a motive, and it had no bearing on the eyewitness identifications of Mendez as the shooter. The state court, after holding a lengthy hearing into Mendez's *Brady* challenge, concluded that the undisclosed information neither was favorable to Mendez in any material way nor tended to exculpate him. In my view, that conclusion was neither "contrary to" nor "involved an unreasonable application of" *Brady v. Maryland* and its progeny, 28 U.S.C. § 2254, for even if the information had been disclosed, I see no reasonable probability that the outcome of the trial would have been different. I would thus reverse the granting of the writ.